**INTERSTATE AUCTION, INC.,**
**Appellant (Plaintiff Below),**

v.

**CENTRAL NATIONAL INSURANCE,**
**GROUP, INC., Appellee**
**(Defendant Below).**

**No. 4–681A42.**

Court of Appeals of Indiana,
Fourth District.

May 12, 1983.

Rehearing Denied June 30, 1983.

James E. Freeman, Jr., Sansberry, Dickmann, Dickmann, Dickmann & Freeman, Anderson, George P. Dickmann, Dickmann, Dickmann & Reason, Greenfield, for appellant.

Jeffrey C. Burris, Burris, Gross, Burris & Margerum, Indianapolis, George B. Davis, Greenfield, for appellee.

MILLER, Judge.

Plaintiff-appellant Interstate Auctions, Inc. (Interstate) appeals an adverse summary judgment rendered in favor of its insurance carrier, Central National Insurance Group, Inc. (Central Insurance). Interstate, an auto auction dealer, filed the instant lawsuit to recover damages for an alleged breach of a contract to insure against bad check losses. Central Insurance moved for summary judgment, contending Interstate had breached a contractual obligation to initiate suit on the policy within one year of its discovery of the loss. Central Insurance claims the loss was discovered when the checks were returned because of insufficient funds. Interstate, on the other hand, contends the loss was discovered when a judgment against the third-party check writer was returned unsatisfied. The trial court granted Central Insurance's motion, and on appeal, Interstate raises the following issues:

1. whether the insurance policy is ambiguous on its face as to when the one-year time limitation begins to run;

2. whether the trial court improperly struck affidavits containing extrinsic evidence proffered by Interstate which tended to show latent ambiguity in the policy as to when such time limitation begins to run;

3. whether genuine issues of material fact remain regarding waiver and estoppel.

For the reasons stated below, we affirm.

## FACTS

The matters properly before the trial court most favorable to Interstate, the non-moving party in this summary judgment proceeding, revealed the following:

Interstate received seven checks totaling $54,020.00 from Carl Bair, d/b/a Carl Bair Motors between October 16, 1978, and November 13, 1978. These checks were given in payment for automobiles purchased through Interstate and were returned shortly thereafter marked "non-sufficient funds." During this period, Interstate held an insurance contract issued by Central Insurance, whereby Central Insurance agreed "to pay the Assured all sums which the Assured shall itself lose because of its acceptance . . . of a bad check or sight draft." Upon return of the checks, Interstate notified Central Insurance first by telephone on November 16, 1978, and then by a letter of November 28, 1978.

Central Insurance began its investigation of the claim on November 20, 1978, pursuant to a reservation of rights agreement, and on January 12, 1979, it denied coverage, asserting that Interstate's business practices contravened certain policy conditions.[1] On May 22, 1979, Interstate submitted a reevaluation of the facts to Central Insurance challenging the earlier denial of liability and requesting additional response to its claim. Central Insurance wrote Interstate on June 8, 1979, to repeat its denial of coverage but offered $7,500 to settle the controversy. Interstate did not respond to this letter but subsequently obtained an Ohio judgment against Carl Bair on the checks in question. It notified Central In-

---

1. The business practices included Interstate's acceptance of post dated checks, its failure to deposit checks within seven days of the auction at which they were received, and its acceptance of checks from Bair after Bair's previous checks had been dishonored.

surance of the judgment on August 20, 1979, and forwarded a copy of the Ohio decree to Central Insurance on September 20, 1979.

Interstate then filed suit on the policy January 21, 1980—more than a year after 1) the checks were returned for insufficient funds, 2) Interstate first notified Central Insurance of the loss, and 3) Central Insurance's initial denial of the claim. Central Insurance moved for summary judgment, asserting Interstate's suit was barred by a policy provision requiring legal action to be initiated within one year after the date of the discovery of the loss. The clause stated in relevant part:

> "Section XIII Suit and Limitations of Actions.... 'In the event that loss shall have been sustained by the Assured then *no action shall lie against the Company unless suit is commenced against the Company within one year after the date of discovery of the loss.* In the event that the loss shall have been sustained by a third person claiming against the Assured then no action shall lie against the Company until the amount of the Assured's obligation to pay after actual trial or by written settlement of the claimant submitted to and approved in writing by the Company." (Emphasis added.)

Central Insurance's motion was supported by the insurance contract, the reservation of rights agreement and copies of correspondence between the parties relating to the claim, as well as an affidavit by Jeffrey C. Burris, Central Insurance's attorney.

Interstate responded and filed a cross-motion for partial summary judgment on the issue of the timeliness of the complaint, offering the affidavits of Cameron C. Cherry and Donald S. Riggs. The Cherry affidavit averred that Cherry, an insurance agent, was an expert in the insurance field and that in his professional opinion, the limitations period did not begin to run until a determination of Interstate's loss on the bad check was "made by a court of law." Riggs's affidavit recited that he was the president of Interstate and that as a result of 1) his experience with Central Insurance and with a prior bad check incident 2) his reading of the policy and 3) Interstate's legal liability to its bank because of its deposit of the bad checks, he opined that Interstate had either one year and 60 days after it had furnished Central Insurance with proof of loss or, in the alternative, one year after the amount of Interstate's loss was determined by a court of law within which to bring the suit.

On November 6, 1980, the court, on motion by Central Insurance, struck both the Cherry and Riggs affidavits, and on December 9, 1980, the court granted summary judgment to Central Insurance. It concluded the insurance policy was unambiguous, the loss was discovered November 16, 1978, and the suit against Central Insurance was untimely filed. This judgment forms the basis for the instant appeal.

## DECISION

Because the case was disposed of by summary judgment, we apply the same standard of review as the trial court, and we will sustain the judgment only if no genuine issue exists as to any material fact and the party is entitled to judgment as a matter of law. Ind.Rules of Procedure, Trial Rule 56(C); *Matter of Belanger's Estate,* (1982) Ind.App., 433 N.E.2d 39; *Donahue v. Watson,* (1980) Ind.App., 411 N.E.2d 741. The moving party bears the burden of establishing that no material facts are at issue and any doubts are to be resolved against him. *Moll v. South Central Solar Systems, Inc.,* (1981) Ind.App., 419 N.E.2d 154; *Lee v. Weston,* (1980) Ind.App., 402 N.E.2d 23. Evidence, pleadings and inferences must be viewed in a light most favorable to the non-moving party. *Randolph v. Wolff,* (1978) 176 Ind.App. 94, 374 N.E.2d 533. We further note that the motion for summary judgment in insurance contract actions presents a different approach than in negligence actions. *Ross v. Farmers Insurance Exchange,* (1971) 150 Ind.App. 428, 277 N.E.2d 29, explained the difference in this manner:

> "Unlike negligence cases, the undisputed facts are not juxtaposed against the stan-

dard of a reasonable man, but rather such facts are interpreted against a specific policy provision, and there are certain situations which clearly show that the insured has not brought himself within the confines of the policy."

*Id.* at 442, 277 N.E.2d at 37. *See also South Tippecanoe School Building Corp. v. Shambaugh & Son, Inc.,* (1979) Ind.App., 395 N.E.2d 320.

*Issue One—Ambiguity in Insuring Agreement*

On appeal, Interstate disputes the trial court's conclusion that the insurance contract was clear and unambiguous. To preface our discussion of its arguments in this regard, we recite some of the basic principles utilized in constructing an insurance contract. The law is established that ambiguity exists when reasonably intelligent men, upon reading the policy, would honestly differ as to its meaning. *Barmet of Indiana, Inc. v. Security Insurance Group,* (1981) Ind.App., 425 N.E.2d 201. However, the mere existence of a controversy as to the meaning of an insurance policy does not establish an ambiguity. *Northland Ins. Co. v. Crites,* (1981) Ind. App., 419 N.E.2d 164. This court must reasonably construe the language of the policy and may not find coverage unless the language of the policy admits liability. *Stockberger v. Meridian Mutual Insurance Co.,* (1979) Ind.App., 395 N.E.2d 1272. Where an insurance contract is ambiguous so as to be susceptible of more than one meaning, it is to be interpreted most favorably to the insured. *Utica Mutual Insurance Co. v. Ueding,* (1977) 175 Ind.App. 60, 370 N.E.2d 373. An unambiguous policy, on the other hand, must be enforced according to its terms, *Drake Insurance Co. of New York v. Carroll County Sheriff's Department,* (1981) Ind.App., 427 N.E.2d 1153, even if this results in a limitation of the insurer's liability. *American States Insurance Co. v. Aetna Life & Casualty Co.,* (1978) 177 Ind.App. 299, 379 N.E.2d 510.

a. *"Indemnity" policy.* Interstate argues that ambiguity arises in the insurance contract because of its characterization as an "indemnity policy," pointing to the following policy language:

"An Indemnity Policy. All claims payable hereunder are payable solely by the Company to the Assured to indemnify the Assured against actual loss suffered. No person other than the Assured may make any claim under this policy."

Interstate argues the instant policy is an indemnity policy rather than a liability policy and contends that under an indemnity policy no action lies against an insurer unless the action is brought to recover monies actually paid in satisfaction of a final judgment after trial. It further contends that Indiana courts have given a specialized meaning to indemnity policies and that an insured could reasonably infer from policy language referring to an indemnity policy that any claim thereunder would have to be reduced to judgment before it could bring an action on the policy. Thus, Interstate urges that under the facts of the case at bar it could not have made any claim against Central Insurance under the indemnity policy until it received a judgment against Carl Bair and that judgment was returned unsatisfied.

To support its argument, Interstate relies on *Iroquois Underwriters v. State ex rel. Morgan,* (1937) 211 Ind. 463, 5 N.E.2d 908, wherein our supreme court construed an auto insurance policy indemnifying the policyholder against loss from liability imposed by law for damages on account of bodily injury. The policy in *Iroquois* provided no action would lie against the insurer unless brought to recover monies actually paid in satisfaction of a final judgment after trial. The court distinguished "liability" and "indemnity" policies in the context of casualty policies, pointing out that the former indemnified against liability while the latter indemnified against loss.

The distinction made by the court in *Iroquois* has no application to the loss incurred here, however. In this case, we are not confronted with policy language describing a casualty insurance situation where an insured is a named defendant. The instant

policy provision does not purport to cover only those losses "imposed by law" or those for which the insured is "legally liable." Instead, the insuring agreement contemplates a situation where the insured has passed valuable goods in reliance on a bad check and seeks recovery for the amount he would have received but for the drawer's defalcation. This type of coverage is more akin to the theft and forgery coverage found in fidelity bonds than to the casualty policy before the *Iroquois* court. *Accord, American National Insurance Co. v. United States Fidelity & Guaranty Co.,* (1968) Miss., 215 So.2d 245.[2] Consequently, we conclude that the insurer's characterization of this policy as one of indemnity has no bearing upon when the one-year limitations period began to run.

b. *Point of Loss.* Interstate's second argument regarding ambiguity centers on the policy's failure to specifically define "loss." Interstate argues the word "loss" is used in various contexts in the policy. To support this contention, it points to a contract phrase which states that the company will indemnify the insured against "actual loss suffered" and to another contract phrase which requires notice of claim of "any loss or claim for which the company may be liable." In its argument on appeal, Interstate refers to the latter context as a "potential loss" and urges there is a dual usage of the word "loss" in the policy—"actual loss" and "potential loss." From this, it urges an "actual loss" from the acceptance of a bad check does not occur until a judgment against its writer is returned unsatisfied. Thus, insofar as the policy's one-year limitation period commences upon the "date of the loss," it would begin to run at the time this judgment is returned.

While our research has revealed no case which defines "loss" in connection with the type of coverage involved here, a number of cases instruct that a "loss" occurs in the context of insurance and bonding *upon the happening of the contingency stipulated in the policy,* regardless of whether the insured has recourse against a third party. *Citizens Bank of Oregon v. American Insurance Co.,* (D.Or.1968) 289 F.Supp. 211; *Fitchburg Savings Bank v. Massachusetts Bonding & Insurance Co.,* (1934) 274 Mass. 135, 174 N.E. 324; *Smith v. Federal Surety Co.,* (1932) 60 S.D. 100, 243 N.W. 664. Indiana case law indicates a similar analysis of "loss" is used in this state. In *Fletcher Savings & Trust Co. v. American Surety Co of New York* (1931) 92 Ind.App. 651, 175 N.E. 247, the court defined the policy term "loss" in its discussion of a fidelity bond which required the insured to give notice to the underwriter as soon as possible after learning of a loss. The court said:

"The word 'loss' as used in the above provision of the contract, means a pecuniary damage to *the insured* for which the insurer may, under the provisions of the policy, be liable, *though at the time the extent of the loss may not be ascertainable.*" (citation omitted) (emphasis added.)

*Id.* at 665, 175 N.E. at 252.

Here, Central Insurance became liable in the event of a bad check loss sustained by Interstate. It seems clear that Interstate suffered pecuniary damage when it accepted the bad checks in exchange for its goods. The return of the checks by the drawee bank signaled the "discovery of the loss" within the intendment of the limitations provision.

The provisions of the policy provide support for Central Insurance's argument that "loss" under the policy occurred when the checks were returned unpaid and marked "NSF." By the policy's coverage terms, Central Insurance agreed to indemnify Interstate "for the *face amount* of a bad

**2.** In other separate coverage enumerated in the policy, Interstate is indemnified for sums it becomes legally obligated to pay because of 1) a loss arising from a seller's acceptance of a bad check, where Interstate guarantees the negotiability of such check, or 2) its warranty or guaranty of title to an auto sold at one of its auctions. Neither party argues or suggests the language in these other coverages is pertinent to the interpretation of the bad check coverage at issue here. Thus, all references in this opinion to the policy coverage provisions apply to coverage on bad checks accepted by Interstate.

check given in payment of automobile(s)," (our emphasis) rather than for any amount irrecoverable against the check writer. In its policy, Central Insurance agrees to pay

> "all sums which the Assured shall itself lose *because of its acceptance ... of a bad check or sight draft ...* given by the purchasing authorized automobile dealer in payment of the purchase price of the automobile(s) purchased at the Assured's auction in a transaction covered hereunder, where the negotiability of such check or sight draft is guaranteed by the Assured." (Emphasis added.)

No policy provision requires Interstate to reduce its claim against the third-party check writer to judgment in order to call upon Central Insurance for payment. Indeed, an examination of the policy discloses that the parties intended Central Insurance, rather than Interstate, to assume the principal role in recovering from the third party. The insuring agreement affords Central Insurance comprehensive subrogation rights—Interstate must transfer its rights and remedies against the purchaser to Central Insurance and must secure to Central Insurance the right to use its name for the recovery of such rights and remedies. The policy also prohibits Interstate from issuing a release to any person. Thus, the parties clearly intended that Central Insurance's liability under the policy was to arise immediately upon dishonor of a check by the drawee bank not upon some future date when Interstate was unable to execute on a judgment against a third party. To recover under the policy, Interstate needed only to show the acceptance of a bad check, the contingency insured against. The later judicial determination of the drawer's liability on the check was relevant only to a determination of the extent of Interstate's loss.[3]

Additional support for this analysis can be found in Section IV of the policy. That section regards notice of claim and states:

> "The Assured shall notify the Company of any loss or claim for which the Company *might be liable* within two business days of information of such loss or claim."

The point at which a loss or claim occurs is clarified in Section X, Rights and Responsibilities of the Assured, which instructs:

> "The Assured by acceptance of this policy agrees to: ...
> D. Report to the company all pertinent facts (not more than two (2) business days thereafter) *upon receipt of information that an insured check has not been paid upon presentation to the bank....*"

From the foregoing discussion of the policy, we conclude that the "loss" referred to in the policy arose upon the acceptance of the bad checks, and the discovery of the loss occurred when the checks were returned to Interstate. Our consideration of all of the terms of the policy supports the trial court's conclusion as to lack of ambiguity as to when the loss occurs. In reaching our conclusion, we have given effect to the intent of the parties as reflected by the language used in the contract, *Ohio Casualty Insurance Co. v. Ramsey,* (1982) Ind.App., 439 N.E.2d 1162, and we have viewed all of the contract's provisions in order to ascertain its meaning, not just individual words, phrases or paragraphs. *Michigan Mutual Insurance Co. v. Combs,* (1983) Ind.App., 446 N.E.2d 1001; *Loving v. Ponderosa Systems, Inc.,* (1983) Ind.App., 444 N.E.2d 896, *transfer pending.* Finally, we have not ignored Interstate's arguments relating to a possible conflict among the provisions, *Jeffries v. Stewart,* (1974) 159 Ind.App. 701, 309 N.E.2d 448, but have accepted a construction of the policy which harmonizes the provisions of the agreement rather than one which views the provisions as conflicting. *Loving v. Ponderosa Systems, Inc., supra.*

*Issue Two—Striking of Affidavits*

Interstate disputes the trial court's striking of Riggs and Cherry's affidavits, argu-

---

**3.** As discussed previously, Interstate interprets "loss" as occurring when a judgment against a third party check writer is returned unsatisfied. We note that great potential for confusion would arise if "loss" were given the meaning urged by Interstate—if bankruptcy were to intervene, a determination of the amount of "loss" could be a lengthy process spanning several years.

ing these affidavits were extrinsic evidence tending to show the policy was latently ambiguous as to when the limitations period would begin to run. Additionally, it claims Riggs's affidavit, established waiver and estoppel.

In addressing this issue, we must consider Ind.Rules of Procedure, Trial Rule 56(E), which requires that supporting affidavits be made on personal knowledge, affirmatively show the affiant is competent to testify and set forth such facts as would be admissible in evidence. The requirements of T.R. 56(E) are mandatory—therefore, a court considering a motion for summary judgment should disregard inadmissible information contained in supporting or opposing affidavits. *Coghill v. Badger,* (1982) Ind.App., 430 N.E.2d 405 (on rehearing).

We do not believe either affidavit submitted by Interstate proffers any specific facts tending to refute Central Insurance's reliance on the contractual limitations clause. The Cherry affidavit describes the affiant's background as well as his employment history in the insurance field and his familiarity with insurance policy terms. It then sets forth his "professional opinion" as to the proper construction of the policy in question. In Riggs's affidavit, he avers that he is president of Interstate Auction, Inc. and is familiar with the insurance policy involved in the suit. The affidavit then incorporates Interstate's answers to interrogatories propounded by Central Insurance, which describe the processing of prior claims under the policy, wherein Riggs admits notifying Central Insurance within two days of the return of the checks and cooperation between Central Insurance and Interstate to collect on the bad checks.[4] In the remaining portion of the affidavit, Riggs avers the following:

1. he, as corporate representative, relied on Central Insurance to assist him as it did in previous claims;

2. Interstate became "legally obligated" to its depository bank by its deposit of the Bair check;

3. in his opinion, Interstate had either one year and 60 days after it furnished Central Insurance with proof of loss or one year after the amount of its loss was determined by a court of law to bring suit on the policy;

4. Central Insurance collected premiums for the automobile checks in question and has failed to return the same;

5. Interstate entertained a reasonable expectation that coverage would be provided.

We believe that the trial court was correct in striking these affidavits as they were merely opinions of the affiants as to how the contract should be interpreted. Neither sets forth any facts which would tend to controvert Central Insurance's assertion that the contractual limitations period had run prior to the filing of the suit. Although termed "extrinsic evidence" by Interstate, the averments consist mainly of conclusions of law regarding the construction of the contract, which do not advance Interstate's position herein. *City of Gary v. State ex rel. Condron,* (1980) Ind.App., 406 N.E.2d 1231, 1235; *Podgorny v. Great Central Insurance Co.,* (1974) 160 Ind.App. 244, 311 N.E.2d 640. We observe that where no ambiguity is found in the terms of a contract, its construction is a matter of law to be determined by the trial court. *Piskorowski v. Shell Oil Co.,* (1980) Ind.App., 403 N.E.2d 838. Further, since we have found the instant contract to be clear and unambiguous on its face, any offer of extrinsic evidence to prove a different construction placed upon it by the parties could not have been considered by the trial court. *Id.*

*Issue Three—Waiver and Estoppel*

Interstate claims that an issue of material fact remains concerning Central Insurance's waiver of or estoppel to assert the time limitation. First, Interstate contends

---

**4.** These answers to interrogatories allegedly establish waiver and estoppel and will be discussed *infra,* under Issue Three.

in its brief that a prior course of dealings between the parties disclosed that neither party considered that there had been an actual loss "until such time as the plaintiff [Interstate] or defendant [Central Insurance] received information indicating the bad check writer would not make good on the check." Interstate urges that Central Insurance waived its right to rely on the policy terms by conducting itself in a manner that led Interstate to believe that it would not assert that the limitations period began running on the date the checks were returned "NSF." Interstate further argues that Central Insurance should be estopped from doing so, absent evidence that it clearly notified Interstate of its intent to rely on the clause in such manner. Additionally, Interstate claims that waiver and/or estoppel is established because Central Insurance "stood idly by and tacitly encouraged the insured's action to recoup directly from the bad check writer before proceeding with an action on the policy."

To establish waiver, an insured must show that conduct or acts of the insurer were sufficient to justify a reasonable belief on the part of the insured that the company would not insist on compliance with the policy terms. *Wallace v. Indiana Insurance Co.*, (1981) Ind.App., 428 N.E.2d 1361. To constitute estoppel, the insurer's acts or statements must be of a caliber calculated to mislead the insured to its prejudice. *C.A. Enterprises, Inc. v. Employers Commercial Union Insurance Co. of America*, (1978) 176 Ind.App. 551, 376 N.E.2d 534. We do not believe that Interstate has established either in the instant case.

The facts here show that Central Insurance explicitly and unequivocally rejected Interstate's claim under the policy on January 12, 1980, over ten months before the one-year period expired. By his letter of June 8, 1977, responding to Interstate's request for reevaluation of its claim, Central Insurance's counsel reiterated the company's position that it was not liable on the Bair checks and explained in detail its reasons for this denial. Although the letter contained an offer to settle the controversy for $7,500, it cautioned that such offer was "in the spirit of compromise and not intending to admit any liability whatsoever." The letter requested that Interstate's counsel advise him as to the status of all efforts taken by the assured against Carl Bair Motors. It further advised Interstate that Central Insurance did not intend to limit or waive any other reasons or defenses for denying the claim. Interstate made no reply to the settlement offer but wrote Central Insurance's counsel on August 20, 1980, and September 20, 1980, advising him that it had obtained on Ohio judgment against Bair and repeating its contention that Central Insurance was liable under the policy for the checks.

Without further conduct on Central Insurance's part, its June 8, 1977 letter is insufficient to render the limitations defense unavailable to it. The letter repeats the denial of liability in no uncertain terms and cannot be considered of a caliber to "lull Interstate into inaction." It is also insufficient to support Interstate's contention that Central Insurance "tacitly encouraged" Interstate to seek recovery against Carl Bair before bringing suit on the policy.

In *Collins v. Dunifon,* (1975) 163 Ind.App. 201, 323 N.E.2d 264, this court held that an insurer's indication of a mere willingness to discuss settlement at a time several months before the expiration of the statute of limitations was insufficient to constitute the basis for estoppel. *See also Martin v. Levinson,* (1980) Ind.App., 409 N.E.2d 1239, where this court, in addressing a related estoppel issue in connection with a statute of limitations defense quoted with approval the following passage from an Illinois case:

" 'The fact that an insurer negotiates with a claimant is not conduct amounting to waiver by estoppel unless the negotiations *contain statements or conduct which are calculated to lull the claimant into a reasonable belief that his claim will be settled without suit. If there is evidence of such conduct which exceeds mere investigation and negotiation an issue is made for determination by the trier of facts; if not, the defense may be disposed*

of by the court as a matter of law.' (Citations omitted) *Flagler v. Wessman* (2nd Dist.1970), 130 Ill.App.2d 491, at 494, 263 N.E.2d 630, at 632, as cited in *Doll v. Farmers Auto Ins. Ass'n*, (3rd Dist.1977), 54 Ill.App.3d 868, 12 Ill.Dec. 635, 370 N.E.2d 258." (Emphasis added.)

*Id.* at 1243.

Interstate contends that Indiana case law requires an insurer to notify the insured of its intent to rely on the contractual limitation period. While this is the law in certain situations where no denial of liability was made by the insurer, *Huff v. Traveler's Indemnity Co.*, (1977) 266 Ind. 414, 363 N.E.2d 985; *Schafer v. Buckeye Union Insurance Co.*, (1978) 178 Ind.App. 70, 381 N.E.2d 519, such are not the facts in the case at bar.

The "prior dealings" which Interstate refers to (and which are revealed in Riggs's answers to interrogatories) are also insufficient to establish any waiver of compliance with the policy on Central Insurance's part. Although Riggs seems to imply Central Insurance waived the limitations provision by encouraging him to pursue the drawer of the checks, he admits in the interrogatories that Central Insurance's position was "one of non-assestance [sic], disclaimer of liability under the policy, and general recalcitrance in attempting mutual mitigation." The evidence merely indicates that upon being notified by Interstate that a check had been returned, Central Insurance routinely requested that Interstate process the check a second time, a procedure which usually took an additional three days, and that Interstate sometimes made additional efforts to persuade the drawer of a bad check to make good on his debt.[5] The trial court correctly held that these facts were insufficient to raise a triable issue as to Central Insurance's waiver of or estoppel to assert the limitation provision.

The decision of the trial court is affirmed.

YOUNG, P.J., and CONOVER, J., concur.

5. We do not construe Interstate's activities as a delay of assumption of liability by Central Insurance. Under the policy, Central had the right to request cooperation of Interstate in collecting from the bad check writer.