HAMILTON AIRPORT ADVERTISING, INC., Hamilton Building Corporation, Hamilton Display Manufacturing Company, a partnership, Renzie M. Hamilton and Kenneth H. Hamilton, Appellants (Defendants Below),

v.

Renetta E. HAMILTON, Appellee (Plaintiff Below).

No. 4–1082A306.

Court of Appeals of Indiana, Fourth District.

April 17, 1984.

Scott Ging, Charles B. Huppert, Huppert & Altman, Indianapolis, for appellants.

David Bikoff, Wood, Tuohy, Gleason, Mercer & Herrin, P.C., Indianapolis, for appellee.

MILLER, Judge.

The multiple corporate, partnership and individual defendants-appellants herein seek the reversal of the trial court judgment awarding Renetta Hamilton $65,-977.25 due her as administratrix and sole heir of William S. Hamilton, deceased brother and business associate of the appellants. Their chief contention is that Renetta has failed to prove she is entitled to monies allegedly due her from two corporations and a partnership as occasioned by William's death and applicable buy-sell agreements regarding his business interests. After a close perusal of the interests

involved here and the issues appurtenant thereto, we must affirm in part and reverse in part.

## ISSUES

The following issues, restated for clarity, do not include all those presented for review but are dispositive of this case:

1. Did Renetta have a valid and binding agreement, executed after William's death, settling disputed amounts due to her for William's business interests? [1]

2. Did the court err in allowing expert testimony in construing the partnership agreement?

3. Did the court err in determining Renetta was entitled to undrawn accumulated earnings left in William's account in the partnership?

4. Was it error to refuse appellants' counterclaim for the return of William's stock certificates? [2]

## FACTS

The following stipulated facts adequately serve as a skeletal foundation for this relatively complex state of affairs:

"1. Renzie M. Hamilton began a display manufacturing business in the late 1940's in which his brother, Kenneth H. Hamilton, subsequently joined him as a partner and, afterwards, a third brother, William S. Hamilton, joined in the business as a partner. A partnership was entered into in January, 1955 [, called Hamilton Display Manufacturing Company].

2. Hamilton Airport Advertising, Inc. [Airport Advertising] and Hamilton Building Corporation [Building Corp.] were later formed by the three brothers for the purpose of being able to provide necessary contractual arrangements with the Indianapolis Airport Authority and for the purpose of holding title to various buildings and real estate. Each of the brothers owned 100 shares of the capital stock of the corporation, there being only 300 shares issued and outstanding of each corporation.

3. On January 11, 1962, the three brothers entered into buy-sell agreements relative to each of the corporations, entitled 'Stock Purchase Agreement,' and new Articles of Partnership for Hamilton Display Manufacturing Company [Display Mfg.].

4. At all times pertinent here, Renzie, Kenneth and William Hamilton were the sole officers, shareholders and directors of each of the corporations and equal partners in the partnership.

5. William Hamilton died on November 24, 1969.

6. In December, 1969, proceeds from a policy of life insurance carried by the partnership on the life of William was paid in the total amount of $57,713.76, which funds were deposited by Renzie and Kenneth in the partnership business.

7. At all times pertinent here, Renetta E. Hamilton was the wife, sole heir

---

[1]. Because we ultimately determine the settlement agreement was not the actual basis for the trial court's decision here, despite the findings of fact and actual order and judgment, we do not address subsidiary issues regarding the alleged agreement—whether the damages awarded here were greater than warranted by the agreement itself, whether all the appellants were bound by the agreement when Renzie Hamilton signed only as president of the partnership, and whether parol evidence interpreting the document was admissible.

[2]. For the reasons which follow, we also find it unnecessary to address certain other issues raised by the appellants:

A. Did the trial court properly find that installment payments of $5,000 and $20,000 were due from the corporations under the terms of their buy-sell agreements within 60 days of William's death?

B. Did the trial court properly find that, with the exception of the $25,000 down payment due from the partnership, the appellants failed to pay in accordance with the buy-sell agreements?

We do not find either of these issues relevant to any ultimate disposition of this case, and the appellants have shown us none. Three additional issues will be summarily treated later in the opinion, but in order to avoid further confusion, they will be presented within the proper context.

and beneficiary, and administratrix of the estate of William S. Hamilton.

8. Renetta Hamilton disputed the figure suggested by Mr. Suttles [of $95,238 as the amount due to William's estate under the pertinent buy-sell agreements].

\* \* \* \* \* \*

11. On June 5, 1970, Renzie Hamilton and Renetta Hamilton met and a document, stipulated Exhibit 4, was prepared and signed by each of them [Exhibit 4 reads as follows:

TO WHOM IT MAY CONCERN:

RE: ESTATE OF WILLIAM S. HAMILTON, DECEASED

Based upon projected estimates relevant to "Buy-Sell" Agreements with the Estate of William S. Hamilton, the approximate value of the Deceased's interest in the Hamilton Display Manufacturing Co., Hamilton Airport Advertising, Inc., and Hamilton Building Corporation is determined to be $125,000.00

/s/ Renzie M. Hamilton
Renzie M. Hamilton
President, Hamilton
Display Mfg. Co.

/s/ Renetta E. Hamilton
Renetta E. Hamilton
Admx. of the Estate of
William S. Hamilton,
Deceased']

Subsequently, payments were made from the various businesses to William S. Hamilton Estate in an initial amount of $1,100 per month.

12. The last payment made to Renetta Hamilton was made December, 1974 and brought the total of payments to her [to] $90,301.69."

Renetta brought suit against William's brothers, Renzie and Kenneth, and the three companies, Display Mfg. (partnership), Airport Advertising and Building Corp., in March, 1976. She sought recovery on three grounds—for breach of the alleged agreement she and Renzie signed, for fraud, and for an accounting and money judgment based on the business affairs of the three companies. The appellants

answered, moved to dismiss all three claims pursuant to Ind. Rules of Procedure, Trial Rule 12(B)(6) and counterclaimed for overpayment to William's estate, for fraud, and for breach of the buy-sell agreements requiring delivery of William's stock certificates upon payment of the purchase price. The trial court sustained the motion to dismiss as to Renetta's claim for an accounting.

The cause went to trial by the court in July, 1981, with the parties presenting evidence not only of the document signed by Renetta and Renzie and its surrounding circumstances, but also, and without objection, evidence of the buy-sell agreements and alleged sums due and owing from the appellants to William and vice versa. There was no significant dispute regarding the monies due William for his stock in the two corporations. The petulant battle here centers on the meaning and interpretation of language in the partnership buy-sell agreement, which purported to delineate the partners' rights and liabilities upon the death of one. We quote these pertinent provisions.

HAMILTON DISPLAY MANUFACTURING COMPANY

"*Article V*

\* \* \* \* \* \*

*Death, Bankruptcy, etc.*

(6) If an[d] in the event that either [sic] of the partners, during the term of this partnership, shall die, or shall be adjudged bankrupt, insolvent, or incompetent, or shall take proceedings for liquidation by arrangement with his creditors, or shall assign or attempt to assign his interest in the partnership in violation of these Articles, then this partnership shall terminate at once, without notice, as to him, and he, or his personal representatives, fiduciaries, or assigns, as the case may be, shall have no interest in common with the other partners in the property of the partnership, but shall be considered in equity as vendor to the surviving or other partners, of his entire share and interest in the partnership, as and

from the day of his said death, adjudication, taking proceedings or assigning, as aforesaid, at a price determined and payable upon terms and conditions as stated in paragraph (7) of this Article V. And the surviving or other partners in any such case shall be considered as having bought the interest of said partner to whom such event shall have happened, and they promise to carry out such purchase and pay said purchase price therefor as herein provided.

*Price.*

(7) The price to be paid to such partner as shall retire, as provided herein, or to the estate of a deceased partner, shall be the sum of Twenty-Five Thousand Dollars $25,000.00), to be paid, in the event of death, within 90 days of established date of death.... In addition to the above, such partner as shall retire, as provided herein, or to the estate of a deceased partner, shall be paid a sum equal to the amount that would have been distributable to said retired or deceased partners out of net profits during the ensuing twelve (12) months of said partnership. This amount shall be paid in twelve (12) equal monthly installments, beginning one year and one month from the established date of death or retirement of such partner." .

Significantly, Renetta presented evidence that at William's death, he had $60,268 in what was alternatively denominated by the parties as a "drawing account" or "capital account" in the partnership. At the same time, Renzie had $11,829 in his account and Kenneth, $51,027 in his. The federal partnership tax returns, along with other testimony, clearly indicated that the annual income from the partnership was divided evenly among the three partners and the equal shares credited to each partner's account. From their respective accounts, each partner was entitled to a weekly draw of $125. However, through the years, each partner had made additional draws, Renzie, of course, drawing out the largest amount by the time William died, as evidenced by the smaller amount remaining in his account. The reason for leaving such funds in the accounts was to accommodate cash flow problems in the business, and withdrawal of one's entire account would have hurt the company:

"[RENETTA'S COUNSEL]: ... had [William] come in and just said, I think I need Sixty Thousand Two Hundred Sixty-eight Dollars [$60,268] and took all that money, would there have been money to run the business?

[KENNETH HAMILTON]: No, no, there wouldn't have been.

Q. If you'd come in and said, I need Fifty-one Thousand Twenty-seven Dollars [$51,027] and taken it all out, would there have been money to run the business?

A. No, probably wouldn't have been.

Q. So people have to leave it in there for the benefit of the business, is that correct?

A. We did, yes, we took it out if it was available, you know.

Q. And the company would then run off the monies that were left in, is that correct?

A. Yes."

Record, p. 737. The following portions of the partnership agreement (as revised in 1962) are the only memorialized references to these accounts:

"ARTICLE II

*Capital and Partners' Interest*

*Capital*

(1) Capital, now held and employed by the partnership, is apportioned as reflected on the partnership books of account.

*Profits and Losses*

(2) The net profits or losses of the partnership, after the payment of the weekly drawing accounts as provided for in paragraph 6 [sic], Article II hereof, shall be divided equally among the partners. ·

*Loans*

(3) If any one of the partners, with the consent of the others, shall loan or advance funds to or for the partnership,

such funds shall not be considered capital but shall be a loan or loans, evidenced by the promissory note or notes of the partnership.

*No Salary or Interest*

(4) None of the partners shall receive any salary for services rendered to the partnership or be paid any interest upon his original or any subsequent contribution to the partnership capital except as provided in paragraphs (3) and (5) of Article II hereof.

*Drawing Accounts, etc.*

(5) The partners shall have weekly drawing accounts to be charged against the earnings of the partnership in the following amounts:

> To Renzie M. Hamilton, Kenneth H. Hamilton and William S. Hamilton, the sum of One Hundred and Twenty-five Dollars ($125.00) each week.

Other distributions of earnings shall be made on the basis of one-third (⅓) of such total amount as shall be distributed to each partner at such time and in such amounts as the partners shall agree upon, including withdrawals found to be necessary for the payment of U.S. income taxes."

Both sides sponsored expert testimony from accountants, who tendered documentary fiscal summaries of monies due to or from William's estate. Renetta's accountant witness Richard Bell testified to the import of the immediately foregoing sections of the partnership agreement. He opined that because the partners had not withdrawn funds in equal measure from their drawing accounts, William must be credited as having *loaned* the partnership the difference. Thus his estate would be entitled to $48,438.78 from his drawing account as the difference between his total account set at $60,268.07 and Renzie's, as the smallest, at $11,829.29. Bell added this sum to the purchase price actually set out

in the buy-sell agreement. He indicated the following sums were due William's estate as based on his valuations and the terms of the agreements.

| | PAYMENTS MADE | PAYMENTS DUE | NET AMOUNTS DUE |
|---|---|---|---|
| DISPLAY MFG. [Partnership] | $46,100.00 | $83,092.78 | $36,992.78 |
| AIRPORT ADV. | 24,202.00 | 25,751.00 | 1,549.00 [3] |
| BUILDING CORP. | 20,000.00 | 22,694.00 | 2,694.00 [3] |
| TOTALS | $90,302.00 | $131,537.78 | $41,235.78 |

Appellants strenuously objected to this expert's testimony in interpreting the partnership agreement, as an invasion of the trial court's province as trier of the law. They also took issue with the alleged status of the partnership accounts as loans because there were no promissory notes as required by the partnership agreement.

The appellants' accountant witness Leroy Prall, on the other hand, presented his own interpretation of the drawing (or capital) accounts in the partnership:

> "It's any capital contributions at the outset plus additionally during the existence of the partnership, plus any share of the profits less any withdrawals...."

Record, p. 516. He then determined William's partnership share by equalizing the accounts as current at his death ($11,829 + $51,027 + $60,268 = $123,124) for an average of $41,041. This average was taken from the actual sum in William's account, giving his account a credit of $19,227. However, this expert did not consider William's account when he computed the amount due under the buy-sell agreement because said agreement made no mention of the capital account. Thus, the appellants' calculations indicate the business overpaid William's estate.

**3.** The sums due the Airport Advertising and the Building Corp. agreements are undisputed. *See* table, *infra.*

| | PAYMENTS MADE | | PAYMENTS DUE | DIFFER-ENCE (OVER) UNDER |
|---|---|---|---|---|
| DISPLAY MFG. | | | | |
| Assumption 1 [4] | $46,100 | | $34,303 | $(11,797) |
| Assumption 2 | $46,100 | | $27,405 | $(18,695) |
| AIRPORT ADV. | $24,202 | | $25,751 | $ 1,549 |
| BUILDING CORP. | $20,000 | | $22,694 | $ 2,694 |
| TOTALS | $90,302 | #1 | $82,748 | $ (7,554) |
| | | #2 | $75,850 | $(14,452) |

In accordance with the parties' requests for findings of facts, the trial court obliged with a lengthy discourse, incorporating the above-quoted stipulations of the parties. In addition, the court interpreted the partnership provisions regarding the capital (or drawing) accounts and the alleged $125,000 settlement agreement signed by Renetta and Renzie. The trial court then propounded the following conclusions and judgment, apparently accepting Renetta's figures:

## "CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, the Court makes the following conclusions:

1. The law is with [Renetta] and against the Defendants.

2. Defendants have failed to prove by a preponderance of the evidence the material allegations of their counterclaim except with regard to [Renetta's] failure to deliver the stock certificates in her husband's name to the Defendants, Hamilton Airport Advertising Company and Hamilton Building Corporation. Such Defendants were not damaged as a result of such failure to deliver the stock certificates.

3. The Defendant, Hamilton Display Manufacturing Company, was indebted to William S. Hamilton on the date of his death in the amount of $48,438.78 for monies loaned to such partnership as a result of unequal distributions of partnership profits among the three partners and [Renetta] is entitled to collect such indebtedness from such partnership in addition to the additional monies owing from each of the Defendants pursuant to the Stock Purchase Agreement and the

By-Sell [sic] Provisions of the partnership agreement. .

5. [Renetta] is entitled to recover the additional sum of One Thousand Five Hundred Forty-Nine Dollars ($1,549.00) from the Defendant Hamilton Airport Advertising, Inc.

6. [Renetta] is entitled to recover the additional sum of Two Thousand Six Hundred Ninety-Four Dollars ($2,694.00) from the Defendant, Hamilton Building Corporation.

7. [Renetta] is entitled to recover prejudgment interest on each of the amounts mentioned in the foregoing paragraph with such interest being due from January 1, 1975 to date as follows:

a. Hamilton Display Manufacturing Company, Renzie Hamilton and Kenneth Hamilton      $22,195.67

b. Hamilton Airport Advertising, Inc.      $ 929.40

c. Hamilton Building Corporation      $ 1,616.40

## JUDGMENT

The Court on the basis of the foregoing Findings of Fact, Conclusions of Law now therefore enters Judgment in this cause as follows:

1. The Court finds, adjudges and decrees that [Renetta] shall recover nothing of the Defendants on Count II of [her] Complaint.

2. The Court finds, adjudges and decrees that [Renetta] shall recover the sum of Thirty-six Thousand Nine Hundred Ninety-two Dollars Seventy-eight Cents ($36,992.78) plus prejudgment interest in the amount of Twenty-two Thousand One Ninety-five Dollars and Sixty-seven Cents ($22,195.67) from the Defendants Hamilton Display Manufacturing Company, Renzie Hamilton and Kenneth Hamilton on County I of [her] Complaint.

3. The Court finds, adjudges and decrees that [Renetta] shall recover the sum of One Thousand Five Hundred Forty-nine Dollars ($1,549.00) plus prejudgment interest in the amount of Nine Hundred Twenty-nine Dollars and Forty Cents ($929.40) from the defendant Ham-

4. The reasoning for two sets of calculations by Prall for valuation of Display Mfg. is not pertinent to our decision. In actuality, it reflects the difference with and without the inclusion of Airport Advertising income as interpreted from the buy-sell agreements.

ilton Airport Advertising, Inc. on County I of [her] Complaint.

4. The Court finds, adjudges and decrees that [Renetta] shall have and recover the sum of Two Thousand Six Hundred Ninety-four Dollars ($2,694.00) plus prejudgment interest in the amount of One Thousand Six Hundred Sixteen Dollars and Forty Cents ($1,616.40) from the Defendant Hamilton Building Corporation on County I of [her] Complaint.

5. The Court finds, adjudges and decrees that the Defendants shall have and recover nothing of [Renetta] on their Counterclaim in this cause.

6. The costs of this action shall be taxed against the Defendants and interest shall accrue on the foregoing Judgment as required by law."

## DECISION

*"Settlement Agreement"*

■ We are first compelled to dispose of all issues concerning the document signed by Renetta and Renzie, which stated William's interest in the three business associations was $125,000. The trial court made findings of fact, which in effect construed the document to be a valid and binding settlement agreement of a dispute between Renetta and the appellants concerning money due to William's estate. However, closer scrutiny of the actual conclusions of law and judgment reveal the court did not necessarily base its ultimate decision on this document as the basis of recovery. Instead, the trial court admitted evidence and testimony, without a relevant objection, regarding the buy-sell agreements and the *actual* valuation of assets and accounts involved in each enterprise such that Renetta's dismissed complaint for an accounting was actually litigated by consent of the parties. It was, thus, that the total amount of money (without interest) exceeded the sum stated in the alleged settlement agreement. And where the parties have tried an issue by consent, despite the stance of the formal complaint, we will

uphold a judgment based thereon. *See Svetich v. Svetich*, (1981) Ind.App., 425 N.E.2d 191. (Indeed, the appellants have no cause for quarrel when one of their counterclaims alleged overpayment and an accounting would have been a necessity to such recovery to determine those damages.) We, of course, note the fact the trial court's written judgment makes direct reference to Renetta's complaint on the settlement agreement when it declared she was recovering pursuant to Count I. However, because we find the basic legal reasoning in the judgment to be correct, we feel justified in ignoring minor technical discrepancies in an otherwise valid judgment. *See Saint Joseph's Hospital of South Bend, Inc. v. Women's Pavilion of South Bend, Indiana, Inc.*, (1983) Ind. App., 451 N.E.2d 1126. Therefore, after due consideration, we need not further address any other issues raised by the appellants regarding this document.[5]

*Expert Testimony*

■ The appellants argue the trial court improperly admitted expert witness Bell's testimony interpreting the provision of the partnership agreement dealing with the drawing (or capital) accounts. Generally, in the absence of ambiguity, the construction of such written contracts is a question of law for the court to decide, *Interstate Auction, Inc. v. Central National Insurance Group, Inc.*, (1983) Ind. App., 448 N.E.2d 1094; *English Coal Co. v. Durcholz*, (1981) Ind.App., 422 N.E.2d 302, and expert testimony on the matter of interpretation is improper. *Federal Life Insurance Co. v. Sayre*, (1924) 195 Ind. 7, 142 N.E. 223. Thus, Bell's testimony was improper. However, the result in this case does not depend upon this evidence (which was in fact incorrect on the law), and we will ignore this error as harmless. *See* Ind. Rules of Procedure, Trial Rule 61.

*Capital (or Drawing) Account*

The expert witness accountants from both sides presented the same evidence of

5. Our disposition of the issue regarding the document naturally moots the appellants' contention it should have been dismissed pursuant to T.R. 12(B)(6).

underpayments from Airport Advertising and Building Corp. to William's estate. Therefore, the vortex of this appeal is whether the estate is entitled to the undrawn funds in William's partnership account. In deciding that the estate is so entitled, we are constrained to construe certain sections of the partnership agreement to determine exactly what the three partners contracted for and what they actually did. This will necessitate defining what the partnership accounts were and deciding where they fit in the scheme of the buy-sell agreement.

Our first chore in this area is to interpret the mechanics of these accounts as detailed in the partnership agreement and as employed by the partners. The particular section of the agreement involved here is as follows:

*"Drawing Accounts, Inc.*

(5) The partners shall have weekly drawing accounts to be charged against the earnings of the partnership in the following amounts:

To Renzie M. Hamilton, Kenneth H. Hamilton and William S. Hamilton, the sum of One Hundred and Twenty-five Dollars ($125.00) each week.

Other distributions of earnings shall be made on the basis of one-third (⅓) of such total amount as shall be distributed to each partner at such time and in such amounts as the partners shall agree upon, including withdrawals found to be necessary for the payment of U.S. income taxes."

Within the same Article II of the agreement is this provision:

*"Profits and Losses*

(2) The net profits or losses of the partnership after the payment of the weekly drawing accounts as provided for in paragraph 6, [sic] Article II hereof,

shall be divided equally among the partners." [6]

■ The above paragraph 5 has stirred up the greatest controversy of the litigation and appeal, such attention we feel being unwarranted. The provision is indeed poorly drafted but not so totally unintelligible, technical nor ambiguous as to need the introduction of parol or expert testimony. Thus, we look to the express language of the document to determine the operation of the agreement and the intent of the parties. *Tucker v. Richey*, (1984) Ind., 460 N.E.2d 964. Parsing the contents of this paragraph we discover the following:

■ The first sentence is self-explanatory—each of the three partners will get $125 weekly from the earnings. So far, so good. The second sentence stirs up a little more trouble, but close attention to antecedents and the plain meanings of words clarifies the problem. "Other distributions [not exclusively "draws" or "withdrawals"] of earnings shall be made on the basis of one-third (⅓) of such total amount [referring to total amount of earnings] as shall be distributed to each partner at such time and in such amounts as the partners shall agree upon, including [among such distributions] withdrawals *found to be necessary* for the payment of U.S. income taxes." Contrary to Renetta's contentions, we believe the partners did abide by this provision but not necessarily in the manner the appellants believe. After reviewing the tax returns submitted by the partnerships and the mandatory nature of paragraph 2 requiring profits and losses be divided equally, we found the earnings had indeed been *distributed* equally to each partner into the partnership accounts. Whether the partners actually *agreed* to this procedure was not in evidence but such is of little consequence in view of the fact they were required to do so. This construction, of course, does not comport with the appel-

---

**6.** We believe the reference to "paragraph 6" in this section is a provision as it existed in the original 1955 version of the partnership agreement that was transferred uncorrected into the current version. The old paragraph 6 is substantially the same as paragraph 5 we have reproduced above. Thus, we feel justified in relying on the continuing efficacy of this paragraph 2 (which used to be paragraph 3) in construing the current agreement.

lants' interpretation either that the unequal *withdrawals* were the subject distributions and acquiesced in, if not actually agreed to, by the partners. In this provision, both "distribution" and "withdrawal" are used separately and for distinct purposes.

We do not perceive the meaning of "distribution" as used in paragraph 5 to mean "disbursement" or as a substitute for "withdrawal" as it is used within the provision. A distinction is made that the partners *shall* receive a certain sum every week. All *"other* distributions" had to be equal, but more in the sense of "[t]he division among a number, ... allotting, ... apportioning," BLACK'S LAW DICTIONARY 562, defining "distribution" (Rev. 4th ed. 1968), and not in the sense of "giving out." *Id.* This selected meaning, of course, distinguishes itself from "withdrawal" but also comports with usage in federal taxation of partnerships where "a partner's share of current partnership net earnings is *deemed to be distributed to him at the close of the partnership tax year whether actually distributed or not.*" P. LITTLE, FEDERAL INCOME TAXATION OF PARTNERSHIPS § 9.19 (1952); *see also Stackhouse v. United States,* (5th Cir.1971) 441 F.2d 465. Thus, whether the partners realized it or not, each received his equal distribution credited to his capital account, as mandated by their agreement.[7]

This construction may fly in the face of all the theories argued and litigated; however, from what was actually done and from the plain meaning of the words in the agreement, this is the logical outcome. It, of course, means that, depending upon our construction of the partnership buy-sell agreement, William's entire capital account of $60,268 is at stake, not some lesser sum reflecting equations balancing the effects of the unequal withdrawals. The actual withdrawals are not at issue here; the distributions to the accounts are.

■ At this point, the construction of the partnership agreement's buy-sell arrangements becomes crucial. Article V, paragraph 6 states that when any partner dies, the partnership shall terminate as to him, and he will be considered the vendor to the others

"of his entire share and interest in the partnership ... at a price determined and payable upon terms and conditions as stated in paragraph (7) of this Article V."

The parties generally have no quarrel with the price affixed in the said paragraph 7— $25,000 plus ⅓ net profits of the next year's business. The problem is whether this price is for the purchase of all claims to and interests in the partnership, including William's partnership account. We do not believe it is.

■ A pivotal determination in this dispute is what William's partnership account actually constituted. The parties alternately called them drawing accounts and capital accounts. In the partnership agreement, their foundational provision is entitled "Drawing Accounts." Typically, the two are distinct and separate accounts:

"According to usual accounting practices, each partner's interest in the partnership is carried in two accounts, one a capital (or investment) account and the other a current (or drawing) account. The amount of a partner's original and subsequent capital contributions is entered in his capital account. His share of profits is credited to his current account and his share of losses debited to his current account."

J. MULDER, M. VOLZ & A. BERGER, THE DRAFTING OF PARTNERSHIP AGREEMENTS 102–03 (1967). Because there is no clear-cut description of these accounts under dual labels, we must look at the surrounding facts and circumstances to determine the actual role of these accounts within the partnership. *Cf., Boynton v.*

---

**7.** This interpretation moots two issues raised by appellants in their criticism of the court's construction of this section of the agreement. They insist the court's interpretation failed to consider that William never objected to unequal draws and that the past history of so taking unequal draws comported with an "agreement" of the partners to do so. These factors are irrelevant because we have confined ourselves to the literal terms of the provision.

*Commissioner of Internal Revenue,* (5th Cir.1981) 649 F.2d 1168, *cert. denied* (1982) 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (treasury regulations inspect circumstances surrounding partnership provisions for actual character of partnership tax loss allocations); *Hamilton v. United States,* (1982) Ct.Cl., 687 F.2d 408. After such review, we decide that the money left in each partner's account was capital and should be so treated.

In Indiana, capital is defined by our case law:

> "When used with respect to the property of a corporation or association the term has a settled meaning; it applies only to the property or means contributed by the stockholders as the fund or basis for the business or enterprise for which the corporation or association was formed. As to them the term does not embrace temporary loans, though the moneys borrowed be directly appropriated in their business or undertakings. *And when used with respect to the property of individuals in any particular business, the term has substantially the same import; it then means the property taken from other investments or uses and set apart for and invested in the special business, and in the increase, proceeds or earnings of which property beyond expenditures incurred in its use consist the profits made in the business. It does not, any more than when used with respect to corporations, embrace temporary loans made in the regular course of business.* As very justly observed by the circuit judge, 'It would not satisfy the demands of common honesty, if a man engaged in business of any kind, being asked the amount of capital employed in his business should include in his reply all the sums which, in the conduct of his business, he had borrowed and had not yet repaid.' "

*First National Bank of Richmond v. Turner,* (1900) 154 Ind. 456, 461–62, 57 N.E. 110, 112–13 *(citing Bailey v. Clark,* (1874) 88 U.S. 284, 22 L.Ed. 651) (Emphasis added); *White v. Reger,* (1980) 49 Or.App. 43, 618 P.2d 1304 ("The 'capital' of a part-

nership is money contributed by the partners for the purpose of carrying on the business.") Accordingly defined, we see the money left in the accounts, diverted from its "use" as spendable profit, to be "invested" to run the partnership business. In fact, Kenneth testified the business would not have survived if he or William had withdrawn their entire accounts, and no one ever stated William was not entitled to that entire account while he was still alive.

■ We have also found Indiana cases where cash contributions to capital are labelled "capital accounts." *See Heckman v. Heckman,* (1956) 235 Ind. 472, 134 N.E.2d 695; *J.M. Schultz Seed Co. v. Robertson,* (1983) Ind.App., 451 N.E.2d 62. This appears to be a common business practice, treating capital contributions as a partner's capital account. *See, e.g., Otey v. Commissioner of Internal Revenue,* (6th Cir.1980) 634 F.2d 1046; *Sellers v. United States,* (4th Cir.1980) 617 F.2d 1042; *Curtis v. Commissioner of Internal Revenue,* (7th Cir.1950) 183 F.2d 7; *White v. Reger, supra.* And, because these accumulated earnings were not treated as loans in accordance with the partnership agreement by making out promissory notes, we feel justified in treating the funds as investments in the business, and therefore, capital. As the situation was so aptly described in a New Jersey case:

> "[S]ome partners drew out all of their interest and all of their profits. Others let a portion of their profits or a portion of their interest remain in the business. By the apparent acquiescence of all the partners, the balance of those profits or interest remaining at the end of each year undrawn were added to the amount of the capital of those of the partners who saw fit to permit them to remain in the business.

> \*    \*    \*    \*    \*    \*

> The sum set apart to each partner at the end of each year was at the disposal of the partner as so much cash put to his credit. He could draw it out and use it

as he chose. If he chose to invest it in the business, it was to be regarded as any other money which he saw fit to so invest. It became a part of the capital, or it became a loan, just as he and the partners agreed. That they agreed to regard these sums as additions to the capital appears beyond all question."

*Molineaux v. Raynolds*, (1896) N.J.Ch., 35 A. 536; *Meyer v. United States*, (7th Cir. 1954) 213 F.2d 278; *contra, Dore v. La-Pierre*, (1962) N.Y., 226 N.Y.S.2d 949 (where partnership agreement specifically excluded accumulated earnings from capital accounts); *see also* F. BURDICK, THE LAW OF PARTNERSHIP 364 (1917) (contribution to capital is not a loan). This description of the untouched funds as capital is in contravention of Renetta's expert witness's testimony that they should be treated as loans. However, the appellants' expert Prall testified to substantially the same determination we have made:

> "It's any capital contributions at the outset plus additionally during the existence of the partnership, *plus any share of the profits less any withdrawals....*"

The next step then is to explain why the buy-sell arrangement as written, does not encompass payment for this account.

■ The terms used in the pertinent provision envision the purchase of William's "entire share and interest in the partnership." There is no mention of a payment for William's contribution to capital, and our statutes clearly eliminate the possibility that capital is within the definition of partnership interest.

■ The Uniform Partnership Act delineates three types of rights in a partnership, two of which are: 1) rights in specific partnership property (IND.CODE 23–4–1–25) and 2) interest in the partnership as one's share of the profits and surplus (IND.CODE 23–4–1–26). *See* IND. CODE 23–4–1–24.[8] The latter we believe to be the contemplated item of purchase in the buy-sell agreement. And there is a

distinction between the partnership interest and capital. *See, e.g.,* IND.CODE 23–4–1–18 (the two are referred to as separate interests). A partnership interest is a salable capital asset of the individual partner. *Stackhouse v. United States, supra,* 441 F.2d 465; *Meyer v. United States, supra,* 213 F.2d 278. Capital, on the other hand, is a liability, a debt of the partnership to a partner. IND.CODE 23–4–1–40; *Dustin v. Commissioner of Internal Revenue,* (9th Cir.1972) 467 F.2d 47. As stated in the same New Jersey case previously cited:

> "It is clear that when these profits were calculated and divided according to the terms of the agreement, and the share of each partner was put to his credit, then, as between the partners, these profits *ceased to be assets of the firm, and became debts due from the firm to each member of the firm.*"

*Molineaux v. Raynolds, supra,* 35 A. at 538. A more recent Illinois case declares:

> "Due to the nature of a partnership, a partner not only has rights in partnership assets and profits ... but also has the right to be repaid the amount of his contributions to the capital of the partnership."

*In re Marriage of Wilson,* (1982) 110 Ill. App.3d 809, 814, 66 Ill.Dec. 508, 511–512, 443 N.E.2d 31, 34–35. And from a purely practical standpoint, a partner could be repaid his capital contribution in full, but his partnership interest would remain.

■ It is undeniable the two are intertwined in the valuation of a partnership in a buy-sell agreement because such arrangement is a dissolution. The worth of one's rights to profits and surplus, the partnership interest, *has* been equated with one's capital contributions and/or capital account for purposes of valuation and sale. *See, e.g., Smith v. Commissioner of Internal Revenue,* (7th Cir.1964) 331 F.2d 298. However, in *Smith, supra,* the value of the capital account was specifically agreed

---

**8.** A discussion of the third partnership right, the right to participate in the management, is not essential to this appeal.

upon as the value of the partnership interest. Indeed, partners may perhaps agree that the actual generation of profits is caused by specific capital contributions, and thus the measure of the partnership interest is the valuation of such capital. However, such agreement is not present in the case before us. Also, we are led by another of our statutes which states that the sale of a partner's interest in the partnership entitles the buyer only to profits. IND.CODE 23-4-1-27. There is no mention of payment of the capital debt owed the selling partner in *addition* to such profits. Thus, we find guidance in decisions of sister states wherein one's capital account is an asset separate and distinct from the partnership interest in valuation for dissolution:

"First, the difference between the fair market value of the partnership's assets, both real and personal, and in its liabilities is determined. Next, the partners' capital accounts, which are debts of the partnership, *Peterson v. Petersen*, 284 Minn. 61, 169 N.W.2d 228 (1969), are subtracted from that figure. Out of the remainder, the partner's percentage interest is determined. *The partner's capital account in full is an additional, separate asset to be included in the division of property.*"

*Johnson v. Johnson*, (1979) Minn., 277 N.W.2d 208, 213; *In re Marriage of Wilson, supra,* 110 Ill.App.3d 809, 66 Ill.Dec. 508, 443 N.E.2d 31; *In re Marriage of Brown*, (1982) 110 Ill.App.3d 782, 66 Ill. Dec. 488, 443 N.E.2d 11. The rationality of this decision to so differentiate is seen most clearly in terms of a practical situation. If we were to limit the value of a partner's interest in the partnership to the contribution of capital, what happens to that value as the partnership repays the capital? The book value of the assets logically increases while the debt of capital is diminishing. However, the partnership interest remains, according to statute as does the right to partnership property. It, therefore, makes more sense to base the value of the partnership interest on the debt-free partnership assets apart from capital liability. Thus, we agree with a federal court in declaring the partnership's buy-sell agreement meant "the *interest* of the deceased [William] in the partnership was purchased, i.e., his right to his share of the *surplus* of assets over liabilities." *Anderson v. United States*, (S.D.Cal.1954) 131 F.Supp. 501. The capital was not included.

■■■ Of course, the internal operation of a partnership and the duties and obligations imposed upon the partners as to each other, set out in our statutes, can be altered by agreement of said partners, *see, e.g., Trifunovic v. Marich*, (1976) 168 Ind. App. 464, 343 N.E.2d 825, but there is no such modification here. In this case, the brothers Hamilton merely agreed to the purchase price of a dead partner's interest. This arrangement did not absolve them of the partnership's liability to repay the undrawn capital contributions. Therefore, under the evidence the court would have been justified in awarding up to $60,268, as the amount representing the capital account, in addition to the agreed price.

The parties here do not dispute that the appellants have paid Renetta $46,100, to date, for William's partnership holdings. It is clear that $25,000 of that represents the $25,000 agreed purchase price for his partnership interest. There was evidently some difference in opinion as to the amount of net profits from the partnership that was due the estate for the twelve months following William's death. However, the trial court settled upon a figure of $9,654 which appellants have not attacked on appeal. Therefore, the buy-sell agreement was interpreted as requiring $34,654 be paid to Renetta under the specific terms of the agreement. The trial court calculated that William's capital account was worth $48,438.78, a figure that is well within the evidence here. Adding the two sums, $34,-654 and $48,438.78, the trial court reached a total of $83,092.78. Subtracting the $46,-100 already paid, the trial court awarded Renetta $36,992.78 as the amount still owing. Again, this was within the evidence; there was no error.

*Stock Certificate*

The appellants counterclaimed for delivery by Renetta of William's stock certifi-

cates for Airport Advertising and Building Corp. By the clear terms of the buy-sell arrangements, she is obliged to turn them over upon payment. We see no reason why she cannot do so upon the appellants' payment of the judgment. Her defense on appeal has been that she does not know their whereabouts, and the trial court found appellants had shown no damage. Regardless of the absence of actual monetary damage, we fail to see how an equitable order for Renetta to perform under the agreement can be denied unless the certificates are actually missing. If such were the case, we would deem it fruitless to order her to do the impossible. However, there was no evidence at trial that she was unaware of their present whereabouts. She merely testified that in an earlier conversation with Renzie she had told him she did not know where the certificates were *at that time*. The present situation is unknown. We therefore reverse the judgment on this counterclaim for return of the stock certificates if they can be located.

For all of the foregoing, we affirm in part and reverse in part.

CONOVER, P.J., concurs.

RATLIFF, J. (sitting by designation), concurs.