**GOVERNMENTAL INTERINSURANCE EXCHANGE, Plaintiff,**

v.

**CITY OF ANGOLA, INDIANA, Defendant.**

No. 1:97–CV–176.

United States District Court, N.D. Indiana, Fort Wayne Division.

Jan. 27, 1998.

Larry L. Barnard, Miller, Carson, Boxberger and Murphy, Fort Wayne, IN, Steve D. Pearson, Monica T. Sullivan, Bates, Meckler, Bulger and Tilson, Chicago, IL, for Governmental Interinsurance Exchange.

Jeffrey A. Townsend, Plews, Shadley, Racher and Braun, Jeffrey D. Claflin, Plews, Shadley, Racher and Braun, Indianapolis, IN, for City of Angola.

## ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the court on cross motions for summary judgment. The Plaintiff, Governmental Interinsurance Exchange ("GIE") filed its motion for summary judgment on October 15, 1997, and the Defendant, City of Angola, Indiana ("the City") filed its motion on October 17. Briefing was completed on November 18, 1997, with the exception of a filing of supplemental authority by the City on December 15, 1997. For the following reasons, GIE's motion for summary judgment is **DENIED** and the City's motion for summary judgment is **GRANTED**.

## STATEMENT OF FACTS [1]

GIE is an Illinois reciprocal insurer with its principal place of business in Bloomington, Illinois. Joint Statement of Undisputed Material Facts, p. 1. The City of Angola is organized under the laws of the State of Indiana and is located in Steuben County.

*Id.* GIE issued annual Local Government Comprehensive General Liability Policies to the City from June 4, 1986 through January 1, 1997. *Id.* Policy No. 1LG09094 was issued to the City for the policy period from January 1, 1996 to January 1, 1997. *Id.,* Exh. A ("the Policy"). On November 22, 1995, the City filed a notice with the Indiana Department of Environmental Management ("IDEM") stating that it intended to close a 300–gallon underground storage tank ("UST"). *Id.,* Exh. B, Underground Storage Tank System Closure Request Form. In a letter dated November 28, 1995, IDEM approved initiation of the closure and instructed the City as to the applicable state and federal regulations, testing protocols, and the additional documentation that would be required. *Id.,* Exh. C, letter from Victoria Kelly to Jennifer Bruner. The tank was located at the City's garage on 300 West Mill Street ("the Site"), which was owned by the City and was used for fueling city vehicles and lawn care equipment. *Id.,* Exh. D, Results of Underground Tank Closure and Closure Site Assessment Report ("Results Report") dated June 1, 1996. GIE did not receive copies of these letters or the Report until August 25, 1997.

During the course of removing the 300–gallon UST, the City's contractor discovered an additional 1,500–gallon UST previously unknown to the contractor or to City officials. Exh. D, Results Report, p. 1; Exh. E, June 10, 1997 Corrective Action Plan Progress Report ("CAP Report"). GIE did not receive copies of the Report or CAP Report until August 25, 1997. Both underground storage tanks at the Site were removed at the direction of the City by Knapp Environmental Construction Services, Inc. ("Knapp"). The tanks were removed on May 2, 1996. Knapp was retained by the City and forwarded its invoice for payment directly to the City. *Id.,* Exh. F, May 6, 1996 Invoice from Knapp to the City.

During and after removal of the USTs, visual inspection of the internal and external tank shells indicated significant corrosion;

---

1. The facts of this case as set forth herein were taken, virtually verbatim, from the Joint Statement of Undisputed Material Facts ("Joint State-

ment of Facts") submitted by the parties on August 27, 1997.

holes were observed in the kerosene tank. Knapp also reported that "a flanged port on the bottom of the tank may have been loose." After removal, groundwater was observed at the base of the excavation. Exh. D, Results Report, p. 2. "[P]etroleum odors and/or visual staining was observed in the soils surrounding the tank. As soils appeared to be impacted with petroleum, a release report was made to the IDEM and the site was assigned Incident # 9605501." *Id.; see also* Exh. E, CAP Report, p. 1. GIE did not receive a copy of the CAP Report until August 25, 1997.

Following the underground storage tank removal, the City initiated an investigation of the Site and then undertook remedial efforts. *Id.*, Exh. G, Invoices from Knapp to the City dated June 24, 1996, July 12, 1996, August 19, 1996, September 23, 1996 and October 1, 1996. According to these invoices, the Site was assessed to determine the extent of environmental contamination, "free product" and water were recovered, and drums and "contaminated soils" were removed. *Id.* In addition to the removal of contaminated soils, the remedial efforts included the installation and monitoring of nine groundwater monitoring wells (Exh. E, CAP Report, p. 2) and the installation of a free-phase product recovery system on July 15, 1996 to "prevent further migration of free-phase product and impacted groundwater." *Id.* GIE did not receive a copy of the CAP Report until August 25, 1997.

Samples from the monitoring wells originally indicated that the groundwater was contaminated with benzene, toluene, ethylbenzene and xylenes ("BTEX"). Exh. E, CAP Report, p. 3. On June 21 and July 31, 1996, the City submitted a 20 Day Abatement Report and an Initial Site Characterization Report to IDEM. *Id.*, Exhs. H and I. By letter dated December 6, 1996, IDEM informed the City that additional site characterization information was still needed and that the City's failure to comply with IDEM's demand for this information could result in civil penalties not to exceed $25,000 per day in addition to the recovery of all costs incurred by the state related to the Site. *Id.*, Exh. J, IDEM's December 6, 1996 letter. GIE did not receive copies of these documents until August 25, 1997. By letter dated July 17, 1997, IDEM acknowledged that the City's site characterization was complete. The agency requested that the City develop and submit a final Corrective Action Plan within 45 days. *Id.*, Exh. K, July 17, 1997 letter from Roy Harbert to William Boyer. GIE did not receive a copy of this letter until August 25, 1997. The City's monitoring and remedial efforts are ongoing. *Id.*, Exh. E, CAP Report.

By letter dated May 3, 1996, Jennifer Bruner, the City Engineer, and Scott Lehman, the City Fire Marshall, informed Don Roe, of Croxton & Roe Insurance Company, that two underground storage tanks had been removed from Angola Street Department located at 300 West Mill Street. *Id.*, Exh. L, May 3, 1996 correspondence to Roe from Bruner and Lehman. According to this letter, at the time of the removal at the Site, "staining of the soil and free product" were observed and "[o]dors were also evident." *Id.* By notice dated May 28, 1996, Don Roe informed GIE's claims office of the removal of the two underground storage tanks due to "possible gound [sic] contaminated." *Id.*, Exh. M, May 28, 1996 Accord Notice. GIE informed the City that its loss was not covered under the Policy due to the operation of the Policy's Pollution Exclusion Endorsement by letter dated June 25, 1996. *Id.*, Exh. N, June 25, 1996 correspondence to Mayor Bill Selman from Robbin Peeken. On June 28, 1996, the City informed Roe that while, in fact, free product was not evident during the initial excavation (thus, correcting a statement in the May 3, 1996 letter), free product was discovered in a monitoring well on May 31, 1996. This was reported to IDEM and the Site was changed to a "high priority" site. *Id.*, Exh. O, June 28, 1996 letter from Bruner to Roe. GIE did not receive a copy of the June 28 letter until August 25, 1997.

On January 7, 1997, the City reasserted its claim for insurance coverage by submitting a letter from counsel to Peeken, the Claims Examiner for GIE who originally denied coverage for the claim. *Id.*, Exh. P, January 9, 1997 letter from Jeffrey Claflin to Peeken. By letter dated February 11, 1997, and in response to the City's January 7 letter, GIE denied coverage a second time—again based

on the pollution exclusion. *Id.*, Exh. Q, February 11, 1997 letter from Mary Mowery to Claflin. On March 13, 1997, the City replied to GIE's February 11 denial letter and again demanded coverage for the claim. *Id.*, Exh. R, March 13, 1997 letter from Claflin to Mowery. On May 15 1997, GIE again informed the City that its loss was not covered under the Policy. *Id.*, Exh. S, May 15, 1997 correspondence to Claflin from Mowery. In that letter, GIE alleged that no "suit" had been filed in connection with this loss and the property at issue was owned by the City. Thus, this letter additionally based a denial of coverage on the language of the Policy's insuring agreement, the Policy's "owned property" exclusion, and the Policy's "voluntary payments" provision. This coverage dispute resulted in this declaratory judgment action and the present cross-motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in

support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 477 U.S. at 252, 106 S.Ct. at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High Sch. Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249–251, 106 S.Ct. at 2511.

## DISCUSSION

 Indiana has certain well-established rules regarding the interpretation of insurance contracts.[2] "Under Indiana law, the

---

2. In their briefs, both GIE and the City apply Indiana law to the issues in this case, so there is obviously no choice of law dispute. In any case, this is a diversity action and neither party has raised a choice of law challenge. Accordingly, the governing law is that of the forum state. *Transamerica Ins. Co. v. South*, 975 F.2d 321, 327 (7th Cir.1992).

interpretation of an insurance policy presents a question of law to be decided by the court." *Cincinnati Ins. Co. v. Flanders Electric Motor Service, Inc.,* 40 F.3d 146, 151 (7th Cir. 1994) (citing *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992)). "The insured has the initial burden of proving coverage under an insurance policy...[and] if an insurer relies on an exclusion within a policy to deny coverage, the insurer must establish that the exclusion applies." *Id.* (citing *Southbend Escan Corp. v. Federal Ins. Co.,* 647 F.Supp. 962, 966 (N.D.Ind.1986)). Clear and unambiguous language in an insurance policy must be given its plain and ordinary meaning. *Id.* (citing *Fidelity & Guar. Ins. Underwriters v. Everett I. Brown Co.,* 25 F.3d 484, 486 (7th Cir.1994)). "An unambiguous provision in an insurance policy must be enforced, even if it results in a limitation of the insurer's liability." *Id.* (citing *Interstate Auction, Inc. v. Central Nat'l. Ins. Group, Inc.,* 448 N.E.2d 1094, 1098 (Ind.App.1983)). "However, where the language of an insurance policy is ambiguous, in that it is susceptible to more than one reasonable interpretation, the court must construe the language in favor of the insured." *Id.* (citing *Alexander v. Erie Ins. Exchange,* 982 F.2d 1153, 1157 (7th Cir. 1993)). At the same time, "a court cannot create an ambiguity where none exists; 'if no ambiguity exists the policy will not be interpreted to provide greater coverage than the parties bargained for....'" *Id.* (quoting *Alexander,* 982 F.2d at 1157). Also "the mere existence of a controversy as to the meaning of an insurance contract does not establish an ambiguity." *Seymour Manufacturing Co., Inc. v. Commercial Union Ins. Co.,* 648 N.E.2d 1214, 1218 (Ind.App.1995) (citing *Harden v. Monroe Guaranty Ins. Co.,* 626 N.E.2d 814, 817 (Ind.App.1993), *trans. denied* )).

The grounds for GIE's motion for summary judgment are summed up in the second and third paragraphs of the company's memorandum in support of its motion. Those paragraphs state, in relevant part, as follows:

In this case, the environmental contamination complained of is clearly the result of pollutants, and therefore, the Pollution Exclusion Endorsement is applicable.

In addition, other policy provisions likewise preclude coverage for the City's

claim. For example, according to the policy's insuring agreement, the policy only provides a defense to "suits" and only provides coverage for sums the City becomes "legally obligated to pay as damages." Because no "suit" has been filed in connection with this claim and the City has not been called upon to pay "damages," this provision further precludes coverage for the City's claim. Finally, the policy also explicitly states that the City shall not "voluntarily" make any payment or assume obligations without GIE's consent. Here, the City chose to investigate and remediate its own property without notice to GIE, and as a result, there is no coverage for this claim to the extent the City incurred liability without notice to or the consent of GIE.

Memorandum in Support of Governmental Interinsurance Exchange's Motion for Summary Judgment ("Plaintiff's Memorandum"), pp. 1–2.

## A. The Pollution Exclusion Endorsement

The pollution exclusion endorsement in the policy reads, in its entirety, as follows:

This policy does not apply to:

(1) *Bodily Injury, Property Damage, Personal Injury* (including, without implied limitation *Personal Injury* arising out of violations of Civil or Constitutional Rights or Assault or Battery), loss, injury or damage arising out of any negligent or intentional act, error or omission, or other similar or dissimilar loss, injury or damage, arising out of the actual, alleged, potential or threatened emission, discharge, dispersal, release, escape or existence of *pollutants,* or any costs, expenses, payments or other obligations arising out of such actual, alleged or threatened emission, discharge, dispersal, release, escape or existence of *pollutants.*

(2) Any loss, cost, expense payment or other obligation arising out of any direction or request by or for any government, or branch or agency thereof, that the *insured* or any other person or entity tests for; monitors; stops, controls or reduces the emission, discharge, escape,

release, dispersal or existence of; cleans up; removes; contains; treats; detoxifies; or neutralizes *pollutants.*

(3) Claims arising out of the insureds' failure to detect, regulate, control, or prevent acts, operations, or omissions which have caused or may be alleged to have caused the emission, discharge, dispersal, release, escape or existence of *pollutants,* or other claims arising out of the insureds' failure to take action or to take appropriate action to detect, regulate, prevent, reduce, or control damage or injury to persons or property resulting from such discharge, dispersal, release or escape of *pollutants.*

(4) Claims arising out of the provision of water, gas or any other product or substance which is or is alleged to be contaminated or potentially contaminated with *pollutants.*

*Pollutants* means (a) any solid, liquid, gaseous or thermal irritants, toxicants, toxicoids, mutagens, teratogens or contaminants, including, without implied limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material, waste material includes, without implied limitation, materials which are intended to be or have been recycled, reconditioned or reclaimed, (b) any other chemical compound or element (including, without implied limitation, any radioactive chemical or element or any subatomic particle) which does or may potentially cause or result in any form of loss, injury or damage to persons or property or which is or may potentially be a threat or hazard to or cause loss, injury or damage to the public or individual health or safety, (c) any sound or noise, (d) any light or other electromagnetic forces, and (e) any odor or smell.

Joint Statement of Facts, Exh. A, Policy (emphasis in original). The parties agree that this endorsement is a type commonly referred to as an "absolute" pollution exclusion. GIE, in arguing that the language of the exclusion is clear and unambiguous, and therefore precludes the City's claim, relies predominantly on the cases of *Muncie Sanitary Dist. v. The Harleysville Ins. Cos., et al.,* Cause No. IP–94–1401–C–D/G (S.D.Ind. 1996) and *Employers Mutual Cas. Co. v. DFX Enterprises, et al.,* Cause No. 20D03–9505–CP–046 (Elkhart Superior Ct.1997). In *Muncie,* GIE, as a third-party defendant, moved for summary judgment. GIE argued that pollution exclusions in insurance policies it issued to the Muncie Sanitary District precluded coverage for claims arising out of the contamination of a landfill. One of the pollution exclusion clauses at issue was identical to the one at issue in the present case. In his unpublished opinion, Judge Dillin, after setting forth the exclusionary language, and without any discussion of any applicable case law, concluded that "examination of the language in these pollution exclusion clauses leads us to conclude that such language is thorough and unambiguous. . . . Consequently, we must accord the policy language its ordinary meaning. In so doing we find that the seven policies issued by GIE do not encompass the damages in issue in the present case." Defendant's Memorandum, Exh. A, Slip Op., p. 7.

In *Employers Mutual,* tenants of a mobile home park sued the park's owner alleging that they had been exposed to "harmful bacteriological and virological agents and harmful and/or disease causing matter. . ." *Id.,* Exh. B, Slip Op., p. 1. The wording of the pollution exclusion at issue in that case (at least that portion of it actually quoted by the trial court) was very similar to the language being discussed in the present case. The trailer park's owner's insurance carrier moved for summary judgment on the basis that the pollution exclusion precluded coverage. The defendants, including the park's owner, argued that since the pollution exclusion did not define "pollutant" to include "bacteriological" or "virological" agents it was therefore not applicable and did not preclude coverage. The Elkhart Superior Court held that notwithstanding that fact, the pollution exclusion did include in its definition of pollutant the words "contaminant" and "waste." The court further found that the water supply in the trailer park had been polluted by the introduction of raw sewage. Concluding that raw sewage constitutes a contaminant and waste (the trial court engaged in a lengthy discussion of dictionary definitions of the various terms at issue), and since the definition of pollutant in the policy included those two terms, the court held that

"the pollution exclusion clause in . . . [the] policy [is] unambiguous within the facts of this case." *Id.,* p. 9.

The City counters GIE's position by distinguishing *Muncie* and *Employers Mutual,* and then arguing that the Indiana Supreme Court has expressly ruled that the very "absolute" pollution exclusion language at issue in the present case is ambiguous. The City first points out that Judge Dillin did not even mention the cases of *American States Ins. Co. v. Kiger,* 662 N.E.2d 945 (Ind.1996) and *Seymour Mfg. Co., Inc. v. Commercial Union Ins. Co.,* 665 N.E.2d 891 (Ind.1996) (discussed below) when he issued his opinion in *Muncie,* even though both cases had been decided several months earlier. As the City points out, Judge Dillin may never have been presented with the *Kiger* holding because GIE's motion for summary judgment in that case was directed at other insurance companies who were third-party plaintiffs in the case, and who, "apparently refused—for obviously self-serving reasons—to argue that the exclusion is ambiguous." City of Angola's Brief in Opposition to Governmental Interinsurance Exchange's Motion for Summary Judgment ("Defendant's Response"), p. 3, n. 6. Whatever the explanation for the absence of any discussion or even mention of *Kiger* in Judge Dillin's decision, claims the City, does not negate the fact that "*Kiger* is the law in this state." *Id.* As to the *Employers Mutual* case, the City argues that it is not persuasive, since the court found the pollution exclusion unambiguous in that case because it concluded that sewage was clearly a "contaminant" or "waste" and both of those terms were included in the policy's definition of "pollutant." Accordingly, argues the City, neither *Muncie* nor *Employers Mutual* are persuasive with regard to the present case.

In support of its contention that "absolute" pollution exclusions are ambiguous as a matter of law in Indiana, the City cites the cases of *Kiger* and *Seymour.* In *Kiger,* the insured owned a gasoline service station, which was the source of an underground gasoline leak. The insurance policy at issue contained a pollution exclusion clause and defined "pollutants" as:

any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

*Id.* at 948. The *Kiger* court stated that:

Clearly, this clause cannot be read literally as it would negate virtually all coverage. For example, if a visitor slips on a grease spill then, since grease is a "chemical" there would . be no insurance coverage. Accordingly, this clause requires interpretation. . . . We are particularly troubled by the interpretation offered by American States, as it makes it appear that Kiger was sold a policy that provided no coverage for a large segment of the gas station's business operations. . . .

In any event, since the term "pollutant" does not obviously include gasoline and, accordingly is ambiguous, we once again must construe the language against the insurer who drafted it. Appellant claims that in common parlance gasoline is sometimes referred to as a pollutant. That may be correct, but the ambiguity remains. If a garage policy is intended to exclude coverage for damage caused by the leakage of gasoline, the language of the contract must be explicit.

*Id.* at 948–49.

In *Seymour,* the EPA filed suit against the company, which was involved in the business of disposing of solid waste, alleging that Seymour had improperly stored barrels of waste at a site and that hazardous materials spilled and leaked into the soil. In *Seymour,* the Indiana Supreme Court discussed its decision in *Kiger* with approval, acknowledging that it had found the term "pollutant" in the pollution exclusion provision in general liability policies to be ambiguous. *Seymour,* 665 N.E.2d at 892. Based on its decision in *Kiger,* the court held that the "absolute" pollution exclusion did not relieve Seymour's insurer of its duty to defend the company against various claims stemming from the environmental contamination. Finally, the City cites the case of *Summit Corporation of America, et al., v. The Travelers Companies, et al.,* Cause No. 49D02–CP–1378 (Marion Sup.Ct.1997). In *Summit,* the policyholder was a manufacturer of metal components whose manufacturing waste products had contaminated a number of sites. Various

insurance companies denied coverage based on an "absolute" pollution exclusion. The Marion Superior Court held for the policyholder and stated that "[t]his court finds that Indiana's courts have definitively ruled that such provisions are ambiguous and do not bar coverage for losses like the ones in this case." City of Angola's Brief in Support of Motion for Summary Judgment ("Defendant's Brief"), Exh. 16, Slip Op., p. 29 (citing *Kiger* and *Seymour*).

Based on those cases, the City takes the position that the "absolute" pollution exclusion at issue in this case "is the same exclusion that the Indiana Supreme Court found ambiguous and unenforceable—not once, but twice—[in *Kiger* and *Seymour*]." Defendant's Brief, p. 7. The City claims that *Kiger* is directly analogous to the present case in that both instances involved an unintended leak of petroleum products from USTs located on the policyholder's property and both insurance policies contained very similar pollution exclusion clauses. Accordingly, the City argues, the pollution exclusion provision at issue in this case is ambiguous as a matter of Indiana law. Thus, according to well established principles, such ambiguity must be construed against the insurer and in favor of coverage.

GIE does cite several cases in which it claims courts have "refused to find absolute pollution exclusions ambiguous in the manner called for by the City." Governmental Inter-insurance Exchange's Brief in Opposition to City of Angola's Motion for Summary Judgment ("Plaintiff's Response"), p. 7, n. 6. However, none of those cases is as closely analogous to the present case as is *Kiger*. More importantly, all of those cases cited by GIE are from other states so none of them involve Indiana law, which is of course controlling.

Finally, all of the cases cited were decided prior to *Kiger*, so even to the extent that they may have been helpful or instructional in the past, they are not so now in light of *Kiger* (and *Seymour*). The Indiana Supreme Court's holding in *Kiger* is clear and controlling. "Absolute" pollution exclusions of the type included in the policy purchased by the City have been determined by that court to be ambiguous. The remedy to GIE and other insurers is to draft a more narrowly tailored exclusionary clause or to successfully lobby for legislation to offset the impact of *Kiger* and *Seymour*.[3] Even if one were able to distinguish *Kiger* from the present case, the very fact that Indiana courts have interpreted the "absolute" pollution exclusion differently renders the clause ambiguous (at least as far as those courts are concerned). Since Indiana law requires that any ambiguity be construed against the drafter and in favor of coverage, *Alexander*, 982 F.2d at 1157, that rule must apply in this case.

## B. Other Policy Provisions Allegedly Precluding Coverage

 As noted previously, GIE argues that several other provisions in the policy preclude coverage in this case. The City, however, argues that GIE has waived its right to rely on any of these additional policy provisions. The City argues that GIE never raised these additional policy provisions—including the lack of "suit," "voluntary payments," and "owned property" provisions—until it filed its declaratory judgment action on May 14, 1997. Thus, the City claims that "[u]nder the doctrine of 'mend the hold' or waiver, GIE should be barred from raising those defenses now." Defendant's Brief, p. 4. In support of this argument, the City cites the case of *Harbor Insurance Co. v. Conti-*

---

**3.** As the City points out, the Insurance Institute of Indiana did in fact lobby for legislation that would, in its words, "attempt to repair the commercial insurance market place before the impact of two Supreme Court decisions is felt.... The Indiana Supreme Court in two recent decisions, [*Kiger*] and [*Seymour*], have created serious consequences for the commercial insurance market in Indiana." Defendant's Brief, Exh. 3, statement prepared by Insurance Institute of Indiana. Legislation codifying the pollution exclusion language was in fact drafted (and it specifically listed "petroleum" in the section defin-

ing "pollutant"). *Id.*, Exh. 2, House Enrolled Act No. 1583. The bill passed both houses of the Indiana legislature, but was vetoed by Governor Frank O'Bannon on May 13, 1997. *Id.*, Exh. 4, Veto Message From the Governor. In his veto message, the Governor stated that such a "bill could adversely affect large and small Indiana business who manufacture or use products that would be considered pollutants under this bill.... The insurance industry can address the problem by drafting a clear and unambiguous contractual pollution exclusion." *Id.*

*nental Bank Corp.*, 922 F.2d 357 (7th Cir. 1990). In *Harbor*, Judge Posner explained that "mend the hold" "is the name of a common law doctrine that limits the right of a party to a contract suit to change his litigating position. In fact the phrase is a nineteenth-century wrestling term, meaning to get a better grip (hold) on your opponent." *Harbor*, 922 F.2d at 362. The Seventh Circuit also explained that the "mend the hold" doctrine was "especially applicable to insurance companies that change their reason for refusing to pay a claim . . ." *Id.* at 363. The City admits that there "may be no Indiana decisions referring directly to the doctrine of "mend the hold" in the insurance context, but the City also argues that "Indiana courts have long held that waiver and estoppel do apply to an insurer's denial of liability." Defendant's Brief, p. 5.

GIE does not contest that the "mend the hold" doctrine exists, to one extent or the other, but maintains that " '[t]he reach of the "mend the hold" doctrine is uncertain.' " Plaintiff's Response, p. 9 (quoting *Harbor*, 922 F.2d at 364). GIE cites numerous Seventh Circuit cases which reference the doctrine and apparently apply it only where a party attempts to take inconsistent positions during litigation over a contract. *Id.*, p. 10. Just two of these cases are: *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 703 (7th Cir.1994) ("mend the hold" doctrine "limits the right of a defendant in a breach of contract suit to change the ground of his defense midway through the lawsuit[.]"); and *Northrop Corp. v. Litronic Industries*, 29 F.3d 1173 (7th Cir.1994) ("mend the hold" doctrine "limits the right of a party to a contract to change its position in the course of litigation[.]"). The Seventh Circuit also acknowledged that "[t]he precise scope of the doctrine, and the extent to which its application in a federal diversity suit is compatible with the principle that the procedures in such a suit are governed by federal rather than state law, are, as we discussed in the *Harbor* case, vexing and unsettling questions." *Northrop*, 29 F.3d at 1177. The Seventh Circuit was (and presumably still is) concerned about the application of the doctrine in light of a party's ability under the Federal Rules of Civil Procedure to amend its pleadings. Also, the situation in *Harbor* was dramatical-

ly different from the present case. In *Harbor*, two insurers argued a specific defense to coverage in their declaratory judgment action. Then, in defending a counterclaim later in the litigation, "the insurance companies changed course 180 degrees" and raised a defense that was the complete opposite of their earlier position. *Harbor*, 922 F.2d at 363. Clearly incensed by this maneuver, the Seventh Circuit discussed and applied the "mend the hold" doctrine in that case. In the present case, GIE has done nothing so egregious. It is true that in its initial letters to the City, GIE denied coverage based only on the pollution exclusion endorsement. Joint Statement of Facts, Exhs. N, Q. It is also true that GIE's additional defenses were not raised until it filed this action on May 14, 1997. In addition to the Complaint, the City learned of these additional defenses by letter sent to counsel for the City by GIE, dated May 15, 1997. Thus, GIE did not suddenly adopt an inconsistent argument in this litigation. Rather, the company attempted to assert additional defenses under the policy of insurance. The City simply presents no persuasive authority to support its position that the "mend the hold" doctrine should apply in this case, thereby precluding GIE from asserting its additional alleged defenses. Even assuming that the City could make some equitable argument based on the doctrines of waiver or estoppel, GIE points out that "Indiana courts have held that an insurer 'is deemed to have waived a defense to coverage under the policy only when the insured is prejudiced by the insurer's delay in notifying the insured of that defense.' " Plaintiff's Memorandum, pp. 15–16 (quoting *Terre Haute First Nat'l Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind.App. 1993)). GIE claims that "the City has not and cannot demonstrate any prejudice from GIE's failure to rely on additional policy defenses in its early denial letters, particularly where, as here, significant information was withheld from GIE until after the filing of this action." *Id.*, p. 16. GIE is obviously referring to the fact, as set forth in the Joint Statement of Facts, that the company did not receive most of the documentation regarding the UST removal and subsequent problems until August 25, 1997, more than three

months after suit was filed. The City retorts that GIE, through its representative Don Roe, was first made aware of the City's claim in May of 1996. Joint Statement of Facts, Exhs. L, M. Accordingly, argues the City, GIE should have asserted any defenses in addition to the pollution exclusion defense at a much earlier point. As a practical matter, it is indeed difficult to see how GIE's delay prejudiced the City. The additional defenses were set forth in the Complaint, at the very outset of this litigation and before any discovery was conducted. The City does not establish that it was prejudiced in its ability to defend this action. Rather, it merely makes an equitable argument that GIE should have disclosed any and all coverage defenses at an earlier point. This is simply not a compelling enough reason to employ the "mend the hold" doctrine, the applicability of which in this case is questionable. Accordingly, each of GIE's coverage defenses will be addressed.

### 1. The Absence of a Lawsuit

█ The policy issued to the City contains the following provision:

[GIE] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages ... and [GIE] shall have the right and duty to defend any suit against the insured seeking damages ...

Joint Statement of Facts, Exh. A. GIE argues that since the City was not a party to any lawsuit regarding the UST contamination, the company is not obligated to reimburse the City for the cleanup costs. GIE admits that "there is no appellate level authority construing Indiana law concerning what constitutes a suit within liability insurance policies ..." Plaintiff's Memorandum, p. 16. In support of its position, GIE cites an unreported Indiana county court case, *Ulrich Chemical, Inc. v. American States Ins. Co.*, 1990 WL 484974 (Ind. July 26, 1990). In *Ulrich*, the insured was notified by the IDEM that it was responsible for remedial cleanup of pollutants at the insured's site in Terre Haute. The policy at issue in that case contained a "suit" clause virtually identical to the one at issue in this case. The trial court held that since Ulrich was not a party to a lawsuit, its insurers were not liable for

the costs incurred during the environmental cleanup. The trial court stated that "[t]he plain and ordinary meaning of the word 'suit' is a cause of action before a court of law, or a court proceeding.... An administrative claim or proceeding is not a 'suit.'" *Ulrich*, 1990 WL 484974 *3.

However, the unreported state trial court case cited by GIE cannot withstand the authority presented by the City to support the contrary position. The City argues that "GIE's narrow interpretation of the term 'suit' is inconsistent with Indiana's rules of construction for insurance contracts and contrary to sound public policy.... [T]he vast majority of courts around the United States, including Indiana trial courts, have found that all kinds of coercive administrative actions ... are 'suits' covered by general liability insurance policies ...." Defendant's Brief, p. 16. The City cites several cases in support of its position. In *Sam Winer & Company, Inc. v. Commercial Union Ins. Cos.*, Cause No. 20D0–19207–CP–347 (Elkhart Sup.Ct.1994), the court held as follows:

Because there is a substantial dispute as to the meaning of 'suit' that ambiguity must be construed in favor of the plaintiff insured and against defendant insurer. Accordingly, 'suit' includes administrative actions under CERCLA and creates a duty of defendant to defend under its CGL policies. This result would not only be consistent with the Indiana rules of construction, but would place Indiana in the mainstream and along side the majority of jurisdictions.

Defendant's Brief, Exh. 15, Slip op. at 18. The City also cites the case of *Riverside Oil, Inc., et al., v. Federated Mutual Ins. Co.*, 1994 WL 904293 (C.D.Ill.). In *Riverside*, the plaintiff insureds incurred costs when they had to clean up four sites where gasoline had been inadvertently discharged. The insurer raised several coverage defenses, including the "no suit" defense. The district court, applying Indiana law, determined that the insurance company's argument was unconvincing. The district judge held as follows:

The defendant contends that because Indiana ... [has] not brought administrative or judicial enforcement proceedings

against the plaintiffs no "suit seeking damages" exists. This logic, however, would encourage insureds like the plaintiff to resist legitimate government demands that sites be cleaned up pending official actions. The parties could not have intended such a result. The defendant does cite an Indiana trial court case that found that an ... IDEM proceeding where the insured was requested to perform certain clean up measures was not a "suit seeking damages." *See Ulrich* ... The court finds that an Indiana appellate court would be more likely to follow *Sam Winer* than *Ulrich* as it is more consistent with Indiana's treatment of insurance cases. Similarly, the court rejects the cases from other jurisdictions that GIE the term "suits seeking damages" a narrow reading thereby encouraging uncooperative behavior by insureds seeking coverage. Therefore, the court finds that the ... IDEM demands at issue in this case are "suits seeking damages."

*Riverside*, 1994 WL 904293 at *6. Thus, the district judge found the reasoning in *Winer* more convincing than that of *Ulrich* and he believed an Indiana appellate court, given the opportunity, would agree. That is precisely what happened on December 12, 1997, when an opinion was issued in the case of *Hartford Accident & Indemnity Co., et al. v. Dana Corporation*, 690 N.E.2d 285, 1997 WL 769214 (Ind.App.).[4] In that case the Indiana Court of Appeals, interpreting policy language virtually identical to that in the present case, held that "[i]n addition to traditional judicial actions, 'suit' includes any coercive environmental administrative proceeding, including ... non-CERCLA demands by state or federal authorities in the form of a Notice of Violation or similar notice requiring site cleanups as part of ongoing compliance with state or federal environmental law ... [and] voluntary cleanup of a site by the policyholder in nominal cooperation with a governmental entity, but under explicit or implicit threat of a formal enforcement action." *Hartford*, 690 N.E.2d 285, 289 (Ind. 1997). Echoing Judge Baker's reasoning in *Riverside*, the Indiana Court of Appeals stated

that "[t]o decide otherwise would encourage insureds to not cooperate with governmental agencies, thus running the risk of huge fines, punitive damages, and delay in remediating environmental pollution." *Id.* 690 N.E.2d at 296. In the present case, the City received directions from IDEM on precisely how to proceed in cleaning up the UST site. Joint Statement of Facts, Exh. C. The City was required to comply with IDEM procedures and to provide the agency with information. *Id.*, Exh. J. The City was warned that if it failed to provide the proper information within a specified period of time, it could "be subject to a formal enforcement action. The significance of a formal enforcement action is the assessment of civil penalties not to exceed $25,000 per day and cost recovery for all state expenditures incurred to date related to your site. Additionally, such an enforcement action may result in the forfeiture of your eligibility for Excess Liability Fund reimbursement." *Id.* It seems quite clear that the City's cleanup efforts were the result of "non-CERCLA demands by state ... authorities" or "voluntary cleanup ... by a policyholder ... in nominal cooperation with a governmental entity ... under explicit or implicit threat of a formal enforcement action." Accordingly, pursuant to the holding in *Hartford*, the "suit" requirement of the policy was satisfied and this coverage defense must fail.

■ As the City points out, GIE makes "a passing reference in its discussion of the *Ulrich* case to the separate but related issue of 'damages.'" Defendant's Response, p. 10, n. 17. GIE writes in its Memorandum that the court in *Ulrich* held that " '[t]he plain and ordinary meaning of the term "damages" does not include environmental cleanup costs incurred to comply with injunctive or regulatory requests or orders.'" Plaintiff's Memorandum, p. 17. To the extent this argument was intended to bolster GIE's argument about the absence of a "suit," or to the extent that it was intended as a separate coverage defense, it fails. That is because the Indiana Court of Appeals specifically held in *Hartford* that "the 'ordinary meaning of damages

4. The City cited the trial court decision in *Hartford* in its briefs. It was a copy of the appellate decision in that case that was included in the

City's Submission of Supplemental Authority filed on December 15, 1997.

is so broad that it encompasses ... environmental response costs.' " *Hartford*, at 297 (quoting *Farmland Industries, Inc., et al..v. Republic Ins. Co. et al.*, 941 S.W.2d 505, 511 (Mo.1997)).

### 2. The Owned Property Exclusion

■ In its Complaint GIE stated that one of its grounds for denying coverage was the policy's so-called "owned property" exclusion. Complaint, p. 4. GIE also raised this policy defense in its May 15, 1997 letter to the City. Joint Statement of Facts, Exh. S. However, GIE does not present argument regarding this exclusion in any of its briefs. Rather, GIE states that:

> In its Complaint, GIE also relied on the owned property exclusion of the Policy as an additional basis for its denial of coverage. However, only after suit was filed did GIE learn for the first time that there was also groundwater contamination present at the site. Because GIE does not know the extent of this contamination or if it has migrated away from the City's property, GIE has not moved for summary judgment on this issue because of those factual issues.

Plaintiff's Memorandum, p. 20, n. 2. This footnote implies that GIE believes that if contaminated groundwater migrated onto property owned by persons or entities other than the City, the company may be liable for any resulting property damage. In light of this court's determination that the pollution exclusion endorsement does not bar coverage in this case, this conclusion (or at least speculation) by GIE would certainly appear to be correct. However, the footnote also implies (or at least the court infers) that GIE maintains that coverage would *not* be available for damages incurred as a result of contamination that affected *only* property owned by the City. In other words, GIE decided not to address the "owned property" provision because it was not yet certain whether, or precisely how, the provision would apply to the facts of this case. The City, however, does address the "owned property" excision in its brief in support of its own motion for summary judgment. Defendant's Brief, pp. 13–16. In any case, because the court does not find this to be a legitimate ground for the denial of coverage in any event, a brief discussion of the exclusion is warranted.

The "owned property" exclusion in the policy states, in relevant part:

This insurance does not apply:

(h) to property damage to

(1) property owned or occupied by or rented to the insured,

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control ...

Joint Statement of Facts, Exh. A. Like many of the other policy provisions at issue in this case, this exclusion may, at first glance, seem to preclude coverage, since the damages incurred by the City were the result of the UST leakage which occurred on City-owned property. However, as the City argues, many courts, including this one, have held that the "owned property" exclusion does not bar coverage in circumstances such as those presented in this case. In *Indiana Gas Company, Inc. v. Aetna Casualty & Surety Co.*, 951 F.Supp. 806 (N.D.Ind.1996), this court addressed the "owned property" exclusion in a general liability insurance policy. In that case, the policy issued to Indiana Gas provided for coverage for property damage but specifically excluded "property owned by the named insured." Indiana Gas incurred millions of dollars in liability as a result of having to clean up contaminated soil and groundwater at several of its gas plants. The company's insurers argued that the "owned property" exclusion barred coverage. This court held that while the "owned property" exclusion would operate to bar coverage for damage to property owned by Indiana Gas, it did not bar coverage "for the *liability* incurred as a result of the damage to its property, because the liability arises from a third-party claim." *Indiana Gas*, 951 F.Supp. at 810. This court also noted that such a conclusion was "supported by Seventh Circuit authority." *Id.* (citing *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699 (7th Cir.1994)). In *Patz*, the plaintiff insureds incurred liability when they had to clean up contaminated sites which they

owned. St. Paul raised coverage defenses, including an "owned property" exclusion. St. Paul then appealed a judgment rendered in favor of the insureds. In affirming, the Seventh Circuit, addressing this exclusion, wrote as follows:

> St. Paul's alternative ground is that the policy excludes coverage for property damage to property owned by the insured, and to date the only contamination from the waste materials generated by the painting operation is to soil and groundwater within the boundaries of the Patzes' own land. But the Patzes are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. How could they? It is a policy of liability insurance, not casualty insurance, on which they have sued. They seek to recover the cost of complying with a government order to clean up a nuisance. The fact that the clean up occurred on their land is irrelevant. For all we know, the damage to the land was much less than the cost of cleaning it up.
>
> We do not understand St. Paul to be arguing that the only liability against which the policy insures is liability to pay damages obtained by a lawsuit (or threat of suit) against the insured. St. Paul does argue that its policy stops short of reimbursing an insured for voluntarily undertaking to reduce potential liability, and we agree. The owner of an automobile cannot charge the expense of a fancy new braking system to his liability insurer on the ground that the system will make it less likely that he will injure someone in an accident. But the Patzes incurred the clean-up costs for which they seek reimbursement under the policy involuntarily.

*Patz*, 15 F.3d at 705. This holding was reiterated in *Joslyn Manufacturing Co. v. Liberty Mutual Insurance Co.*, 23 F.3d 1212, 1214 n. 1 (7th Cir.1994), in which the Seventh Circuit stated:

> Several of Liberty's arguments address the issue of so-called "owned property." Even if Liberty were not estopped from raising these points, recent caselaw demonstrates that the arguments are without merit. Joslyn is seeking to recover the costs of complying with an Illinois order to clean up contamination, so that the fact

that the cleanup occurred on Joslyn's land is irrelevant. *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 705 (7th Cir.1994). As explained by the *Patz* court, the plaintiffs there, like Joslyn here, were not seeking to recover for damage to their property but rather to recover the cost of liability imposed on them by a state agency.

*See also, Anderson Development Co. v. Travelers Indem. Co.*, 49 F.3d 1128, 1134 (6th Cir.1995); *Savoy Medical Supply Co., Inc. v. F & H Mfg. Corp.*, 776 F.Supp. 703, 709 (E.D.N.Y.1991); *Unigard Mut. Ins. Co. v. McCarty's 'Inc.*, 756 F.Supp. 1366, 1369 (D.Idaho 1988). Based on this case law, the court determines that the "owned property" exclusion in the City's liability policy does not bar coverage in this case.

## 3. The Voluntary Payment Provision

Finally, GIE argues that coverage is barred as a result of the policy's "voluntary payments" provision. That provision states: "The insured shall not, except at [its] own cost voluntarily make any payment, assume any obligations or incur any expense other than for first aid to others at the time of the accident." Joint Statement of Facts, Exh. A. GIE argues that the City "on its own initiative, investigated and remediated its own property. As a result, the 'voluntary payments' provision of the Policy is also implicated." Plaintiff's Memorandum, p. 19. GIE admits that while "there is no Indiana authority construing this provision, other jurisdictions have considered it." Plaintiff's Memorandum, p. 19. GIE then cites one case, *Coil Anodizers, Inc. v. Wolverine Ins. Co.*, 120 Mich.App. 118, 123, 327 N.W.2d 416 (1982), wherein the Michigan court of appeals stated:

> [Voluntary payments] clauses are usually found in liability insurance policies giving the insurer the right to defend and settle any claim made against its insured and prohibiting the insured from voluntarily settling any claims without the insurer's consent. The purpose of such clauses is to prevent collusion between the claimant and the insured and to GIE the insurer control over settlement negotiations.

Thus, argues GIE, since the City voluntarily initiated the events which resulted in its incurring damages, this provision was breached and bars coverage. The City claims first that *Coil Anodizers* is distinguishable from the present case since the "claim against the policyholder was made by one of its customers, a private, non-governmental entity." Defendant's Response, p. 10. The present case is quite different, claims the City, since in this case "the underlying claimant is a governmental entity to which the policyholder's failure to respond, by itself, holds the promise of substantial civil penalties and escalation of the enforcement action." *Id.* The City argues that there was nothing "voluntary" about its obligation to pay the costs associated with the UST cleanup. Rather, "IDEM required the City to engage in expensive remedial measures." Defendant's Brief, p. 23. The City cites the case of *Maryland Casualty Co. v. Wausau Chemical Corporation,* 809 F.Supp. 680 (W.D.Wis.1992) in support of its argument. In *Maryland Casualty,* the district court addressed the voluntariness of the settlement of a CERCLA proceeding, when Wausau was instructed by the EPA to remediate certain sites. The court held that:

> Wausau Chemical counters that invitations by the EPA can hardly be termed "voluntary" because of the consequences that await potentially responsible parties who decline to participate in negotiations and force the EPA to remediate the site itself and sue later to recover costs. These consequences include punitive damages penalties of up to three times the cleanup costs ... and civil penalties of up to $25,000 per day ...
>
> ...
>
> The majority of courts addressing this issue have held that costs incurred when an insured engages voluntarily in cleanup activities in advance of litigation are covered under comprehensive general liability policies ... Although Wausau Chemical did appear to have a choice of engaging in negotiations with EPA or holding back and refusing to comply until fully forced, this choice was superficial at best. The legislative history of CERCLA provides evidence that the stiff penalties for failure to negotiate with EPA were intended to make the

primary force behind cleanup efforts voluntary settlements, rather than drawn-out litigation ... To hold that such settlements are "voluntary" for purposes of an insurance policy exclusion would frustrate the intent of Congress.

*Wausau Chemical,* 809 F.Supp. at 695–696 (citations omitted). The City also cites again to the *Patz* case. The Patzes were directed by the Wisconsin Department of Natural Resources to perform cleanup and remediation on their property. They spent some $400,000 doing so and sued their insurance carrier for reimbursement. While the court did not address a "voluntary payments" provision directly, it did hold that the Patzes were "seek[ing] to recover the cost of complying with a government order ..." and that "the Patzes incurred the clean-up costs for which they seek reimbursement under the policy involuntarily." *Patz,* 15 F.3d at 705. The City argues that "payments made or actions taken in response to coercive environmental actions in an effort to avoid the increased cost and civil penalties associated with drawn-out litigation are in no way 'voluntary.'" Defendant's Brief, p. 24. GIE argues that the *Maryland Casualty* case is inapplicable because it involved a CERCLA action and so such action was instituted in the present case. This is, of course, similar to the arguments GIE presented on the issue of the "absence of suit," which this court has rejected. GIE states, in fact, that "[a]s with the cases cited in support of its 'suit' argument, *Maryland* involves a CERCLA action, which is simply not the case here." Plaintiff's Response, p. 13. GIE also argues, without citing any authority to contradict *Maryland Casualty* or *Patz,* that "IDEM has not 'required' the City to engage in any of these 'expensive remedial measures.' Instead, the City itself initiated its own investigation of its property and hired and paid its own contractor to clean up its pollutants." *Id.* The court does not find GIE's position persuasive. First, as stated, the company cites no authority to refute the City's argument, supported by *Maryland Casualty* and *Patz,* that the costs it incurred were not actually voluntary. Furthermore, as a practical matter, GIE presents no evidence that any of the remediation work, which was re-

quired pursuant to state and federal environmental laws, would somehow have been conducted differently had GIE been involved in the process earlier. Arguably, GIE could have hired contractors on its own to conduct the remediation work and thereby saved some money. But GIE does not allege that it would have done so had it been afforded the opportunity. Also, once GIE was informed of the City's claim, it denied coverage based on the pollution exclusion endorsement. It is difficult to understand, then, how anything would have turned out differently even if the City had sought GIE's consent prior to beginning work on the UST site. Presumably, GIE would have taken the position that there was no coverage under the policy and the City would have been forced to proceed on its own anyway. Finally, the same policy concerns addressed above during the discussion of the issue of the "absence of suit" are also applicable to this issue of "voluntary payments." That is, if cooperation with state or federal agencies is enough to invoke a "voluntary payments" provision and bar coverage, an insured would be left with no choice but to defy the governmental entity at least long enough to attempt to ensure that any loss will be a covered loss. In many instances, this may "have the detrimental effect of inducing policy holders to avoid cooperation with state environmental agencies ... in the administrative process 'in order to invite the filing of a formal complaint' to prompt the insurer's duty to defend ...' This would defeat public interests in judicial economy and in encouraging early settlement and administrative resolution of environmental clean-up problems." Defendant's Brief, pp. 21–22 (citation omitted). Finally, as was pointed out in a case cited by GIE, "[t]he purpose of [voluntary payments] clauses is to prevent collusion between the claimant and the insured and to GIE the insurer control over settlement negotiations." *Coil Anodizers*, 120 Mich.App. at 123, 327 N.W.2d 416. This is a legitimate reason for inclusion of such clauses in liability policies, but that reason is not defeated by holding that a "voluntary payments" provision is inapplicable to the facts of this case. And, GIE has not so much as raised an allegation that there was any collusion between the City and IDEM (or Knapp or any other party). Thus, GIE has not suffered the sort of prejudice the provision is designed to prevent. Accordingly, the "voluntary payments" provision does not operate to bar coverage in this case.

### CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment filed by Plaintiff Governmental Interinsurance Exchange is **DENIED** and the Motion for Summary Judgment filed by Defendant City of Angola is **GRANTED**.